[No. A109876. First Dist., Div. Five. Jan. 31, 2006.]

HOWARD S. WRIGHT CONSTRUCTION CO., Plaintiff and Appellant, v. BBIC INVESTORS, LLC, Defendant and Respondent.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts II.C. and II.E.

## COUNSEL

Farella Braun & Martel, Jeffrey A. Sykes, Anthony D. Giles; McQueen, Ashman & Mollis, James A. McQueen and Brian E. Bisol for Plaintiff and Appellant.

Reed Smith, Paul D. Fogel, Dennis Peter Maio, Walter M. Schey and Martin H. Schey for Defendant and Respondent.

## OPINION

**STEVENS, J.**—Howard S. Wright Construction Co. (Wright) sought to foreclose a mechanic's lien recorded against the property of BBIC Investors, LLC. After a nonjury trial, the court determined that Wright's recordation of its mechanic's lien was premature and the lien was therefore void. On appeal, Wright contends this was error.

In the published portion of this opinion, we conclude the trial court erred because Wright recorded its claim of lien after its contract was completed, within the meaning of Civil Code section 3115, upon the anticipatory breach of the other contracting party. In the unpublished portion of the opinion, we conclude as an alternative basis for reversal that the trial court's key factual

finding was not supported by substantial evidence. Although Wright's remaining arguments lack merit, for the foregoing reasons we reverse the judgment.

## I. *FACTS AND PROCEDURAL HISTORY*

Respondent BBIC Investors, Inc. (BBIC), owned a former warehouse building located at 2201 Poplar Street in Oakland, California. 360networks (USA) inc. (360), a telecommunications company, leased space in the premises from BBIC. 360 retained Wright to perform the construction work necessary for installing in the leased space a high-tech facility for 360's Internet business. To this end, Wright and 360 entered into a written design-build agreement. Meanwhile, BBIC posted and recorded a notice of nonresponsibility at the premises, intending to prevent the attachment of any mechanic's lien to its interest in the real property.

### A. *The Design-build Agreement*

The project covered by the design-build agreement was referred to as the "Oakland POP site." The contract described a work of improvement involving structural alteration of about 22,500 square feet for 360's use as a "POP" (point-of-presence) site for computer servers. Essentially, it involved converting a warehouse into a modern Internet facility, with seismic upgrades, upgraded power, backup generator, air conditioning, "dry" sprinklers, waterproofing, and more. The budget for the project was approximately $5.2 million. Under section 12.1 of the design-build agreement, however, 360 could make "changes by additions, deletions, or revisions."

Wright customarily maintained separate contracts for separate projects under separate job numbers. As explained by Wright's comptroller, Dawn Stephens, Wright followed the practice of the construction industry generally, which is "dominated by job cost accounting," wherein "costs are accumulated and coded to particular projects" depending on the type of contract. Wright's work under the design-build agreement was assigned job No. 6821. Indeed, Wright billed all of its work at the site under job No. 6821.

### B. *Modification of the Design-build Agreement*

Wright began work under the design-build agreement in March 2001. By May, however, it became clear that 360 was having serious financial trouble. In a letter dated May 10, 2001, 360's project manager, Jeff Garren, advised Wright's project manager, Hanno Nehrenheim: "Effective immediately 360networks has decided to place the Oakland POP site on hold. All necessary actions shall be taken to reduce capital expenditures at this time."

Garren also requested Nehrenheim to do what was necessary to leave the site "safe, secure and in compliance with all applicable codes."

Wright advised its subcontractors that the project had been placed on hold. A few days later, Nehrenheim sent an e-mail to Garren and BBIC's representative Foraker, with an attached "punchlist" of items Wright "plan[ned] to work from in getting the site ready for our departure."

On May 24, 2001, Nehrenheim sent Garren a letter with a subject line of "Authorization for Final Closeout Work." The letter set forth the "final costs and work to be completed on this project" and requested formal authorization for this "additional work." The estimated price for the closeout work was $194,950. In an internal e-mail the next day, 360's Garren noted the "mothballing" of the project, construction of which was only about 65 percent complete.

Garren responded to Nehrenheim's May 24 letter with an e-mail on May 29, 2001. In the e-mail, Garren authorized Wright to proceed with the work described in Nehrenheim's letter. Specifically, he stated: "Please proceed with the items listed in your Authorization for Final Closeout Work letter of 5/24/01. The cost of this work ($194,950) should be completed in four (4) weeks and be billed in addition to and separately from HSW's May '01 application for payment." (As will be seen, BBIC contends this May 29 e-mail evinced the parties' modification of the design-build agreement, while Wright contends—for the first time on appeal—that the e-mail confirmed the parties' "abandonment" of the design-build agreement and a separate "closeout contract.")

On June 7, 2001, Nehrenheim sent an e-mail message to Tom Gallagher, Wright's vice-president and regional manager, stating: "360 stock dropped below a $1.00 today, closing at 99 cents. May want to *lien a little early*." (Italics added.)

An inspection for the closeout work was set for June 26, according to a June 14 e-mail from Garren, which bore the subject line of "Oakland POP (inspection of closeout work)."

On or about June 18, however, 360 advised Wright that it was not going to pay Wright any more money. Wright's chief financial officer, John Tremper, memorialized the conversation by correspondence dated June 19: "This letter is to confirm our phone conversation yesterday at which time you informed me that 360networks does not intend to make any payments on any of our contracts for at least 30 days even though certain amounts are due. You were unable to give me any assurances that payments due would be made after the

30-day period. [¶] That conversation indicates 360networks intention to breach the terms of our Agreements. [¶] If any of the above statements are incorrect, please contact me immediately, otherwise we will take appropriate action."[1] The record contains no response from 360 to Tremper's letter.

Also on June 19, Wright's laborers and tradesmen left the construction site. According to Wright, no more work was done at the site under any contract with 360.

### C. *Wright Records Its Claim of Lien on June 20*

Wright on June 20, 2001, recorded its claim of mechanic's lien against the subject improved real property, in the amount of $2,452,412, for "work, labor, materials and supervision for the renovation of [that] space . . . , furnished by [Wright] to be used and actually used in that certain work of improvement consisting of the renovation of said property" under "contract with . . . 360networks (USA) Inc." Wright later recorded a partial release of its mechanic's lien claim in the amount of $144,073, resulting in a claim of $2,308,339.

### D. *Work After June 19*

According to Nehrenheim's testimony at trial, Wright's work, "including the mothball or closeout work," was substantially completed on June 19, 2001, since that was the last day subcontractors pulled material or did any work on the project.

From Wright's job diary, however, the last work performed under job No. 6821 did not occur until June 26, 2001, when Wright moved some ductwork. Similarly, when asked at trial when construction stopped, Nehrenheim replied that the last entry was on June 25, in regard to moving out materials, while the last entry referring to subcontractors was on June 19. In addition, Nehrenheim acknowledged, the closeout inspection meeting took place at the site on June 26 as scheduled.

### E. *360 Files Bankruptcy*

On June 28, 2001, 360 filed a petition for reorganization under chapter 11 of the United States Bankruptcy Code (11 U.S.C.).

---

[1] The reference in the letter to "contracts" and "Agreements" (plural) was apparently due to the fact that Wright was working on multiple jobs for 360, at sites in San Jose as well as Oakland and elsewhere.

### F.  *Wright's Foreclosure Action*

Wright filed its complaint to foreclose the mechanic's lien on August 6, 2001. Soon thereafter, Wright recorded a notice of pendency of its foreclosure action—its lis pendens.

#### 1.  *Writ on Participating Owner Doctrine*

BBIC, citing the notice of nonresponsibility it had filed, brought a motion for removal of Wright's mechanic's lien and expungement of its lis pendens. In response, Wright invoked the participating owner doctrine, by which it claimed that a lessor's notice of nonresponsibility is without effect if the lessor caused the work of improvement to be performed by requiring the lessee to make improvements. Based on BBIC's notice of nonresponsibility, the trial court ordered Wright's mechanic's lien removed and its lis pendens expunged.

In July 2002, Wright petitioned this court for a writ of mandate in case number A099318, seeking to set aside the trial court's orders removing its mechanic's lien and expunging its lis pendens. We issued a peremptory writ of mandate directing the trial court to vacate the orders and to conduct further proceedings in the foreclosure action. (*Howard S. Wright Construction Co. v. Superior Court* (2003) 106 Cal.App.4th 314, 326–327 [130 Cal.Rptr.2d 641].) The matter was remanded for trial.

#### 2.  *Trial*

In January 2004, the issues of liability and damages were bifurcated for trial. In September 2004, trial to the court commenced on the issue of liability.

After presenting the evidence summarized above, as well as evidence relevant to the participating owner doctrine, Wright announced its intent to rest its case. The trial court pointed out that Wright had neglected to address the issue of licensure or establish one of the elements of its cause of action—the validity of the mechanic's lien. The court observed that Wright's claim "may be premature," and "if [Wright] rest[s] now and [BBIC] says, I want judgment [under Code of Civil Procedure section 631.8], [it]'ll get it."

Wright decided not to rest its case. Instead, it again called Nehrenheim as a witness, among others. This time, led to some extent by Wright's attorney, Nehrenheim testified there was not simply a project for construction of the Oakland POP site project, but also a "closeout project." According to Nehrenheim, 360 abandoned the original construction project as of its May

24 letter, the closeout project began on May 24, and the May 29 e-mail confirmed that 360 was abandoning the construction project and Wright was performing just closeout or "mothballing" work.

In addition, Nehrenheim elaborated on the work performed at the site after June 19. As of that date, he explained, the project trailer remained on site and was full of project-related documents. Over the next few days, Nehrenheim and project superintendent Vince Wright emptied out the trailer and sent files back to Wright's San Francisco office. They spent some time at the trailer working on other matters as well, but did no work for 360.

Nehrenheim also accounted for the entries in Wright's job diary for June 20–22 and 25–26, 2001, which indicated that Wright had moved ductwork at the site on those dates. Nehrenheim asserted that BBIC's Dennis Henry had asked if the ductwork could be moved from the second floor, where it would have been installed if the closeout work had been finished, to a secured area on the first floor. Nehrenheim agreed, and he and Vince Wright used a pickup truck to move the ductwork as requested. The record does not state exactly how long this took, but Nehrenheim testified they loaded and drove the pickup truck "three to four" times from the second floor to the first floor. According to Nehrenheim, the fact that the work was recorded as the only entry on the job diary for four days did not mean the work was being done all day, or even every one of those days, but just that the task was started on June 21 and the last load had not been run until June 26. Nehrenheim testified that no one was billed or charged for this work.

On cross-examination, Nehrenheim did not identify any formal contract for the purported "closeout" project, referring instead to just the May 24 letter from Wright and the May 29 e-mail from 360. He acknowledged that Wright's closeout work fell within the "fixed general conditions" provision of the design-build agreement under job No. 6821, covering demobilizing the field office, final cleaning, and site security—which was included in Wright's mechanic's lien. And although Nehrenheim asserted there were two projects at the site, he never claimed the work was performed under more than one contract.

### 3. BBIC's Motion for Judgment

After Wright rested its case, BBIC moved for judgment pursuant to Code of Civil Procedure section 631.8, asserting that Wright's lien, recorded on June 20, was recorded prematurely in light of Wright's work at the site after that date. (See Civ. Code, § 3115.)[2]

---

[2] Except where otherwise indicated, all statutory references hereafter are to the Civil Code.

At the hearing, the parties agreed that timely recording of the claim of lien turned on section 3115 (which provides that a lien must be filed after the contractor has completed the contract), and section 3086, which the court and parties understood to define "completion." Wright maintained that its claim of lien was timely recorded, in part because there were really two projects—one for construction and the other for closeout—and 360's abandonment of the *construction* project on May 29 constituted actual completion under section 3086. The court stated that it was "struggling with [Wright's] notion that there are two projects," because Wright had "lumped them together in the same lien claim" under the design-build agreement. To Wright's assertion that "it is obvious from the facts it is not one project," the court responded, "I guess the trier of fact isn't seeing the obvious. I think this is one project." Alternatively, Wright argued, its lien was timely recorded, because under section 3086 a lien could be filed 60 days after labor ceased on June 19.

The trial court postponed its ruling on the motion until after the close of evidence. (See Code Civ. Proc., § 631.8, subd. (a).)

### 4. *BBIC's Case*

In its case-in-chief, BBIC introduced evidence regarding Wright's purported premature recordation of the lien claim, as well as the participating owner doctrine. Among the exhibits were subcontracts and subsequent settlements with subcontractors which, BBIC contended, disclosed Wright's understanding that it entered into subcontracts with subcontractors for a single "job," namely, job No. 6821 for the Oakland POP site project under the design-build agreement.

The parties submitted posttrial briefs addressing, among other things, the issue of premature recordation. The trial court took the matter under submission.

### 5. *Order Granting BBIC's Motion for Judgment*

The court's tentative decision indicated its intent to grant BBIC's motion for judgment based on Wright's failure to timely record its claim of lien. The court explained that Wright's June 20 recordation was premature, because the lien could not be recorded until after the contract was completed (§ 3115), "completion" occurs 60 days after cessation of labor (§ 3086, subd. (c)),and since Wright claimed that work ceased on June 19, the contract was not completed until around August 20, long after the recordation of the claim of lien. In addition, the court concluded, Wright's recordation was premature in light of its factual finding that work on the project did not actually end until June 26, six days after the claim of lien was recorded. Wright

filed a "REQUEST FOR ADDITIONAL STATEMENT OF DECISION." (See Cal. Rules of Court, rule 232; Code Civ. Proc., § 632.)

On March 1, 2005, the court issued a final statement of decision, which repeated the findings and conclusions from its tentative decision and added, in partial response to Wright's request for an additional statement, some public policy reasons for its order. Judgment was entered in favor of BBIC.

This appeal followed.

### G. *Pending Writ*

After entry of judgment dismissing the foreclosure action, BBIC obtained an order from the trial court expunging the lis pendens that Wright had recorded based on the mechanic's lien. Wright in turn petitioned this court for a writ of mandate (appeal No. A110279), seeking to set aside the expungement order and requesting a stay of the order pending appeal. We granted the stay. We will rule on the petition by separate order.

### II. *DISCUSSION*

At issue in this appeal is whether the trial court erred in granting BBIC's motion for judgment, on the ground that Wright had recorded its mechanic's lien prematurely. To begin, we embark on a cursory overview of mechanic's liens.

■ A "mechanic" in this context is one who has supplied materials or labor for the improvement of real property (other than the property's owner), and includes a contractor. To secure obligations owed by the owner to the mechanic pursuant to contract, the mechanic may file a lien on the improved property, which is sometimes referred to as the work of improvement. (See generally Cal. Const., art. XIV, § 3; § 3109 et seq.; 10 Miller & Starr, Cal. Real Estate (3d ed. 2001) Mechanics' Liens, §§ 28.1–28.7, pp. 5–28 (Miller & Starr).)

As a requirement of enforcing the lien, the mechanic must record a claim of lien in the appropriate recorder's office within a statutory time period. (See, e.g., § 3115.) After the claim is recorded, the mechanic may initiate an action to foreclose the lien against the owner of the real property interest. (§ 3144.)

■ To prevail in a foreclosure action, the plaintiff bears the burden of proving, among other things, the validity of the lien. (*Basic Modular Facilities, Inc. v. Ehsanipour* (1999) 70 Cal.App.4th 1480, 1485 [83

Cal.Rptr.2d 462].) For the lien to be valid, the claim of lien must have been timely recorded in compliance with the applicable statute. (*Remington v. Mulholland* (1931) 118 Cal.App. 479, 481 [5 P.2d 667]; see *M. Arthur Gensler, Jr. & Associates, Inc. v. Larry Barrett, Inc.* (1972) 7 Cal.3d 695, 703 [103 Cal.Rptr. 247, 499 P.2d 503].)

■ As relevant here, the timeliness of the recording of a claim of lien is governed by section 3115, which provides both an earliest date and a latest date for timely recording. Section 3115 reads: "Each original contractor, in order to enforce a lien, must record his claim of lien *after* he completes his contract and *before* the expiration of (a) 90 days after the completion of the work of improvement as defined in Section 3106 if no notice of completion or notice of cessation has been recorded, or (b) 60 days after recordation of a notice of completion or notice of cessation." (Italics added.) The parties do not dispute that Wright was an "original contractor" for purposes of sections 3095 and 3115. (See § 3095; Miller & Starr, *supra*, Cal. Real Estate, Mechanics' Liens, § 28:8, at p. 31.)

It is not asserted, nor did the trial court find, that Wright's recordation was *late*. Rather, the court determined that Wright recorded its claim of lien too *early*. Relevant here, therefore, is the portion of section 3115 defining the earliest a claim of lien may be filed and still be timely: "after [the contractor] completes his contract."

The trial court and the parties have interpreted this phrase in varying ways at different stages of the litigation. We consider this issue in the next two sections.

## A. *Construing the Trial Court's Decision*

The trial court ruled that Wright's June 20 recordation was premature, in part because it occurred less than 60 days after Wright stopped working at the site. The court reasoned that section 3086, subdivision (c), provides that "completion . . . in the case of any work of improvement other than a public work," occurs 60 days after cessation of labor under certain circumstances.[3] However, section 3115 refers to "completion of such *work of improvement*"

---

[3] Section 3086 provides in part: " 'Completion' means, in the case of any work of improvement other than a public work, actual completion of the work of improvement. Any of the following shall be deemed equivalent to a completion: [¶] (a) The occupation or use of a work of improvement by the owner, or his agent, accompanied by cessation of labor thereon. [¶] (b) The acceptance by the owner, or his agent, of the work of improvement. [¶] (c) After the commencement of a work of improvement, a cessation of labor thereon for a continuous period of 60 days, or a cessation of labor thereon for a continuous period of 30 days or more if the owner files for record a notice of cessation."

only in the context of calculating the *last* date for timely recording. The *earliest* date for timely recording turns on completion of the *"contract."* (Italics added.) Thus, to the extent the trial court employed "completion of such work of improvement," as defined by section 3086, subdivision (c), to determine when Wright had "complete[d] [its] contract" for purposes of establishing the earliest permissible date under section 3115, the court conflated the statutory nomenclature, if not the applicable legal standard.

Wright lambastes the trial court for this, spending part of its opening brief parading the horribles of what it claims to be such an errant construction of law. What Wright does not mention is the fact that it was *Wright itself* who led the trial court down this path. In Wright's memorandum of points and authorities regarding the timeliness of recordation, Wright had asserted that recordation is not premature if accomplished after "completion" under section 3115, and defined "completion" *by reference to section 3086.* In particular, Wright insisted that it could timely record its lien within 150 days after the closeout project was deemed "complete" *under section 3086, subdivision (c),* by 360's refusal to pay on June 19, 2001. (Wright also argued it could timely record its lien within 90 days after 360 abandoned the construction project on May 29, 2001.)

Then at the hearing on BBIC's motion for judgment, Wright's counsel expressly confirmed that section 3115 *and section 3086* applied to the issue of the lien's *pre*maturity: "THE COURT: Do you think Civil Code Section 3115 applied? [¶] MR. MCQUEEN [Wright's attorney]: Yes, Your Honor. [¶] THE COURT: Do you think that Civil Code Section 3086 applies? [¶] MR. MCQUEEN: I think it applies as well, Your Honor." Expounding on its written submission, Wright's counsel then offered two arguments that the lien was timely recorded *under section 3086:* (1) 360's abandonment of the construction project constituted "actual completion" of the contract *within the meaning of section 3086;* and (2) Wright's cessation of labor triggered a 60-day period in which Wright could timely record the claim of lien *under section 3086.*[4]

Ordinarily we would consider whether to dismiss the appeal based on doctrines such as invited error or waiver. (See generally *Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 403 [87 Cal.Rptr.2d 453, 981 P.2d 79] [invited error as estoppel]; *Doers v. Golden Gate Bridge etc. Dist.* (1979) 23 Cal.3d 180,

---

[4] During the discussion, the following exchange occurred: "THE COURT: Well, if we look at cessation of labor as occurring on June 19, the 60-day period would end sometime around August 20th. And, *thereafter,* a lien could be filed. [¶] MR. MCQUEEN: *That's what time the Gensler case says.* [¶] THE COURT: Is that what the statute says? I'll first start with the statute." (Italics added.) This may have led to the trial court's ruling, although Wright's counsel also argued that filing *within* the 60-day period would not be premature.

184–185 [151 Cal.Rptr. 837, 588 P.2d 1261] [waiver or forfeiture].) We need not do so in the matter before us, because the propriety of the court's ruling does not turn on its construction of the statute. (See below.) But it is nevertheless rather disingenuous—and disrespectful to the trial court—to attack the court and its ruling without acknowledging Wright's own contribution to the court's misstatement of the law.

In any event, any error in this portion of the court's legal analysis does not in itself compel reversal. It is well established that we may uphold a judgment on a theory other than those relied upon by the trial court. (*14859 Moorpark Homeowner's Assn. v. VRT Corp.* (1998) 63 Cal.App.4th 1396, 1403 [74 Cal.Rptr.2d 712].) Moreover, factual findings in the statement of decision could furnish a basis for affirmance, whether the legal standard was articulated correctly or not. In particular, the court concluded that Wright's recordation was premature based on the finding that "work ceased on June 26, 2001." This finding, if supported by substantial evidence, could indeed warrant a conclusion that recordation was premature, unless the contract was "complete[d]" within the meaning of section 3115 in some other manner before the June 20 recording. To the question of statutory construction we now turn.

## B. *Meaning of "Completes His Contract"*

The meaning of the phrase "completes his contract" in section 3115 is a question of law we decide de novo. (See *Gary C. Tanko Well Drilling, Inc. v. Dodds* (1981) 117 Cal.App.3d 588, 594 [172 Cal.Rptr. 829] (*Gary C. Tanko*).)

■ The parties agree that a construction contract is "complete[]" within the meaning of section 3115 if the contractor's obligations have been fully performed. As a corollary, a contract is generally *not* completed for purposes of section 3115 if work under the contract *remains* to be done. (Cf. *Lewis v. Hopper* (1956) 140 Cal.App.2d 365, 366–367 [295 P.2d 93] (*Lewis*).)[5] More precisely, a contractor completes the contract upon substantial performance of its obligations. (*Hammond Lumber Co. v. Yeager* (1921) 185 Cal. 355, 358 [197 P. 111] (*Hammond Lumber*); see *Lewis, supra,* at p. 367.)

---

[5] *Lewis* did not interpret section 3115, but is somewhat instructive on the broader concept of completion. In *Lewis*, a subcontractor recovered against a contractor under a labor and materialmen's bond, which provided that a lawsuit had to be filed within six months after completion of the "work described in the contract." (*Lewis, supra,* 140 Cal.App.2d at p. 366.) The subcontractor's lawsuit had been filed *more* than six months after the notice of completion was filed, but *less* than six months of the installation of four soap dispensers pursuant to the contract. The court held the lawsuit was timely, since the installation of four soap dispensers was work described in the contract, and the suit was filed within six months of installing the soap dispensers. (*Id.* at pp. 366–367.)

Although Wright has no quarrel with this interpretation of section 3115 in the event of full performance, it maintains that a contractor also "completes his contract" when, by some event before full performance, it no longer has any further obligations under the contract. Thus, where the contract has been rescinded or otherwise terminated, Wright insists, it is "complete[]" at that point for purposes of commencing the lien recordation period under section 3115.

Generally speaking, we agree. If a contract could never be deemed complete under section 3115 unless all the work was performed, a contract cut short by mutual termination or the owner's material breach would never be "complete[]," the contractor could never timely record its claim of lien, and its lien could never be enforced. This would not only be contrary to common sense, it would conflict with legal authority. (See *Schwartz v. Knight* (1887) 74 Cal. 432, 434 [16 P. 235] [owner of property on which a building has been commenced cannot deprive a provider of materials of its right to file a timely lien by refusing or omitting to finish the building]; see also *Perazzi v. Doe Estate Co.* (1919) 40 Cal.App. 617, 619 [181 P. 398] [claim of lien was not prematurely recorded where all work actually agreed upon and requested had been done, notwithstanding discussion of a larger project]; Cal. U. Com. Code, § 2106, subds. (3) & (4) [upon termination of contract governed by Commercial Code, all obligations which are still executory are discharged].) It would also be contrary to the Legislature's intent to fairly balance the interests of contractors and property owners, since it would certainly place the contractor at a severe disadvantage.[6]

■ Simply put, a contract is complete for purposes of commencing the recordation period under section 3115 when all work under the contract has been performed, excused, or otherwise discharged.

Applying this rule to the matter before us, Wright contends the design-build agreement was terminated (by the parties' abandonment or mutual rescission) and novated (by formation of a new and separate "closeout contract" for closeout work) by May 29, 2001. Furthermore, Wright urges, this new "closeout contract" was terminated (by 360's anticipatory breach) as of June 19, 2001. Because by June 19 both contracts had been terminated,

---

[6] Having an earliest day for recording the lien attempts to strike a balance between the contractor who wants to secure its right to be paid, and the property owner who does not want its property burdened with a lien until the contractor's obligations are fulfilled. (See *Gary C. Tanko, supra,* 117 Cal.App.3d at p. 594 [legislative intent behind mechanic's lien statutes is to balance interests of lien claimants and property owners]; *Diamond M. Co. v. Sanitary F. Co.* (1925) 70 Cal.App. 695, 702 [234 P. 322] [discussing effect of lien on property owner].)

and Wright no longer had any contractual obligations to 360, Wright insists its recordation of the claim of lien on June 20 was timely. BBIC, by contrast, asserts that the design-build agreement was merely modified in May 2001, and work under the design-build agreement in any event continued *past* June 20, 2001, rendering the recordation premature.

We therefore turn to these arguments, examining first whether there was a modification of the design-build agreement or a rescission or novation, then whether there was an anticipatory breach, and finally whether the work was completed before the claim of lien was filed. (Cf. § 3123 [claimant is not precluded "from including in the lien any amount due for labor, services, equipment, or materials furnished based on a *written modification* of the contract or as a result of the *rescission, abandonment, or breach* of the contract" (italics added)].)

### C. Modification or Rescission/Novation of the Design-Build Agreement[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### D. Termination of the Design-build Agreement by Anticipation Breach

Wright contended in the trial court that the closeout project was completed by 360's repudiation of its obligation to make payments on or before June 19. In this court, the argument has morphed into a theory that a separate "closeout contract" was terminated as a matter of law by 360's anticipatory breach on June 19, and the closeout contract was thus complete as of that date. Because we have determined that there was no separate closeout contract, this particular argument is unavailing.

Nevertheless, 360 unquestionably repudiated its obligations as to *any and all* of its contracts with Wright on June 19. Thus, while there was no closeout contract, and the design-build agreement was neither rescinded nor the subject of novation, Wright's obligations under the design-build agreement terminated due to 360's anticipatory breach of *that* contract. This conclusion derives plainly from the evidence at trial, the record on appeal, and the legal propositions debated by the parties in their appellate briefs.[13]

---

[*]See footnote, *ante*, page 228.

[13] As mentioned, Wright did not specifically contend in the trial court that the design-build agreement was completed for purposes of section 3115 on the ground that 360 perpetrated an anticipatory breach of *that* contract on June 19. Rather, Wright argued that the events of June 19 either reflected an abandonment of the construction project or coincided with a cessation of labor. As a general rule, theories not raised in the trial court cannot be asserted for the first time on appeal, out of fairness to both the trial court and the opposing parties. (See generally *Richmond v. Dart Industries, Inc.* (1987) 196 Cal.App.3d 869, 874 [242 Cal.Rptr. 184].) Unlike

■ Anticipatory breach arises where a party repudiates performance of its obligations before they come due; if sufficiently significant, the anticipatory breach discharges the other party's obligations and creates in the other party the right to pursue remedies for breach immediately. (*Romano v. Rockwell Internat., Inc.* (1996) 14 Cal.4th 479, 489 [59 Cal.Rptr.2d 20, 926 P.2d 1114].)

The communications and actions of 360 and Wright around June 19, 2001, demonstrate anticipatory breach. On or about June 18, 360 told Wright that it had no intent or ability to pay any more money to Wright. Wright's CFO then wrote: "This letter is to confirm our phone conversation yesterday at which time you informed me that 360networks *does not intend to make any payments on any of our contracts for at least 30 days even though certain amounts are due. You were unable to give me any assurances that payments due would be made after the 30-day period.* [¶] *That conversation indicates 360networks [sic] intention to breach the terms of our Agreements.* [¶] If any of the above statements are incorrect, please contact me immediately, otherwise we will take appropriate action." On June 19, apparently without financial assurances from 360, Wright pulled the laborers and trades people from the construction site. As Gallagher testified at trial, "My recollection is once we had word from 360 that they did not intend to pay their invoices, we took that as *anticipatory breach of contract and we stopped.*" (Italics added.) In fact, 360's anticipatory repudiation triggered recordation of the lien, and as we discuss *post*, Wright thereafter performed no significant work at the site under the design-build agreement. The evidence thus confirms that the contract was terminated as of June 19.

■ Because of 360's anticipatory breach of the design-build agreement, Wright had "complete[d] [its] contract" within the meaning of section 3115 on June 19. Accordingly, the recording of its claim of lien on June 20 was not premature. (§ 3115.)

Wright's rescission and novation claims, however, the concept of anticipatory breach *was* in play at trial. One of Wright's witnesses expressly referred to an "anticipatory breach of contract" arising on June 19 from 360's refusal to pay, and Wright argued this failure to pay ended its obligations to perform to 360. Moreover, we have discretion to consider a new theory on appeal if it pertains to a question of law on undisputed facts. (*Yeap v. Leake* (1997) 60 Cal.App.4th 591, 599, fn. 6 [70 Cal.Rptr.2d 680].) Because there is no material dispute about the facts underlying 360's anticipatory breach, we would exercise such discretion here in the interests of justice.

E.   *Completion of Performance of the Contract**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

III.   *DISPOSITION*

The judgment is reversed and the matter is remanded for further proceedings consistent with this opinion. Wright shall recover its costs on appeal from BBIC.

Jones, P. J., and Simons, J., concurred.

A petition for a rehearing was denied February 24, 2006, and respondent's petition for review by the Supreme Court was denied April 26, 2006, S141896.

---

*See footnote, *ante*, page 228.