Filed 8/29/22

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE


| | |
|---|---|
| KENNETH HALE et al., <br><br>    Petitioners and Appellants, <br><br>v. <br><br>CALIFORNIA PUBLIC EMPLOYEES' RETIREMENT SYSTEM, <br><br>    Defendant and Respondent. | A161758 <br><br>(City & County of San Francisco Super. Ct. No. CPF18516340) |


After Kenneth Hale and Robert Wolf retired from public service, they sought to have California Public Employees' Retirement System (CalPERS) include in their pension calculations "cash-outs" they received for accrued holiday leave credits. CalPERS declined to do so, and the trial court upheld its decision. Hale and Lavonne Wolf (the heir of Robert Wolf, who is now deceased) have appealed the judgment. We reverse.

**FACTUAL AND PROCEDURAL BACKGROUND**

Hale and Wolf were both firefighters with California's Department of Forestry and Fire Protection (Cal Fire), and for the last ten years of their careers both served as executive officers for Cal Fire Local 2881 (Local 2881 or the union). The union is the exclusive bargaining representative for firefighters, fire captains, and other fire control employees of Cal Fire in State Bargaining Unit 8. Agreements between Bargaining Unit 8 and the State of California and Cal Fire (the Agreements) allowed the president of

1

the union and one other designee (the latter usually the rank and file representative; collectively, the union officers), to be released from their normal work duties in order to conduct union business full-time. The Agreements specified the release "shall result in no loss of compensation (salary or benefits)."

In lieu of normal holidays (New Year's Day, Thanksgiving, etc.), members of Local 2881 receive floating holidays with pay, accrued on the day of the pre-existing holiday. The holiday credits may be used at another time; for instance, a firefighter who normally works on Thursdays would not have Thanksgiving off without making special arrangements, but would on Thanksgiving accrue a floating holiday. As a general matter, the Agreements allow employees to "cash out" up to four holidays per year only if funds are available, and they may not carry over more than six holidays from one calendar year to the next. However, for the union officers the Agreements provide that once a year, Cal Fire will buy down their leave credits to either "the normal carry-over maximum" or the amount the person had when entering office, whichever is higher. These mandatory buy downs, or cash-outs, are at the heart of the dispute before us.

Wolf became a firefighter in 1978. He was elected president of Local 2881 in 2002 and held that position until his retirement in 2012. Hale began working for Cal Fire in 1968. In 2004 he was elected the union's state rank and file director and held that position until he retired in 2013.

During that time, Hale and Wolf were on full-time leave from their firefighting positions, but they remained Cal Fire employees and their pay was determined by their rank in Cal Fire. Both of them were promoted to the rank of battalion chief during their tenure as union officers.

Firefighters at Cal Fire normally work a 72-hour workweek, in the form of three consecutive 24-hour shifts. While they were union officers, Hale and Wolf still reported three 24-hour days, for a 72-hour week, in the same way active firefighters reported their time, but, as we shall explain, this did not reflect their actual or intended work schedule.

Hale testified that his responsibilities included negotiating the union contracts and handling violations of the contracts, adverse actions against employees, and accident investigations. He was not permitted to work on fires. Cal Fire's union office is open from 8:00 in the morning until 4:30 in the afternoon. Hale was generally in the office from 9:00 in the morning until 6:30 or 7:00 in the evening on weekdays, but he would speak with members of the bargaining unit seven days a week and on occasion he would go to the office on weekends. He was expected to work every day while he was a union officer, and his holidays, such as Christmas and the Fourth of July, were sometimes interrupted, as was a trip to Hawaii with his wife. He recalled one Thanksgiving when his family had a large gathering at their home, and he had to spend eight hours on the telephone in response to an incident at the site of a fire. He would receive work-related phone calls on weekends "with some regularity" and sometimes in the middle of the night, and he was expected to answer the phone.

Hale did not take any holidays off during his tenure as a union officer, and no one at Cal Fire expressed any concern that he was not using any of his holiday credits. He was told the position meant he was on duty 365 days a year, 24 hours a day. If he had turned off his phone and taken a holiday, he testified, he would have been fired. While he was a union officer, Cal Fire "cashed out" Hale's holiday leave credits by issuing a check to reflect the amount of his accrued leave. He would have preferred not to have the leave

3

cashed out, but he was told he had no option. When he retired in 2013, all of his remaining holiday credits were cashed out.

Wolf testified that, as president of the union, he acted effectively as the chief executive officer, meeting with the district vice presidents regularly; making sure the union operations complied with applicable laws, procedures, and policies; sitting on the board of directors of the California Professional Firefighters; supervising the 237 elected union officials in the state; managing day-to-day-operations; maintaining the union's political operation; interacting with Cal Fire management; and managing the training program for union officers. Although he reported a standard workweek of three 24-hour shifts, in fact he worked far more than that. He worked in the office five days a week, and he did not take regular days off. There was never a day that he did not receive telephone calls, and he routinely was on his cell phone five hours a day. He did not think he had the option to turn his phone off.

Wolf did not take a holiday during the ten years he was the union president. No one ever questioned why he had not taken holidays. Cal Fire cashed out Wolf's unused holiday leave credits, whether he wanted that or not.

During years Wolf and Hale were union officers, Cal Fire (although somewhat inconsistently) bought down their holiday leave credits, Wolf's to the amount he brought into office and Hale's to six holidays, the normal carry-over maximum. The cash-outs were not reported to CalPERS as income to be included in pension calculations, and the union officers did not make any contributions from those amounts.

After Hale and Wolf retired, the union asked CalPERS to include the amounts they received in the cash-outs when calculating their final compensation, part of the formula on which pension benefits are based.

4

CalPERS concluded the buy downs were not "compensation earnable" as defined by the Public Employees' Retirement Law. (Gov. Code, § 20000 et seq. (PERL); see §§ 20630, subd. (b), 20636.)[1] The union officers appealed this determination.

The matter proceeded to an administrative hearing. Ultimately, after proceedings we need not detail here, an administrative law judge (ALJ) issued a proposed decision concluding the cash-outs were not "compensation earnable" and therefore should not be included in Hale and Wolf's final compensation for purposes of calculating their monthly retirement allowances. CalPERS's board adopted the ALJ's proposed decision as its final decision.

Hale and Wolf then filed a petition for writ of administrative mandamus. (Code Civ. Proc., § 1094.5.) The trial court denied the petition, and Hale and Wolf have appealed.

## DISCUSSION

### I. Standard of Review

Where, as here, an administrative mandamus action affects a vested, fundamental right to receive a pension benefit in an amount specified by law, the trial court exercises independent judgment when reviewing the evidence admitted at the administrative hearing to determine whether it supports CalPERS's findings regarding the amount of pension benefits. (*Molina v. Board of Administration, etc.* (2011) 200 Cal.App.4th 53, 60–61 (*Molina*).)

On appeal, we review the trial court's factual findings for substantial evidence, viewing the facts in the light most favorable to the prevailing party. (*Molina, supra*, 200 Cal.App.4th at p. 61.) Questions of law are subject to de novo review on appeal, bearing in mind that "where our review requires that

---

[1] All undesignated statutory references are to the Government Code.

5

we interpret the PERL or a PERS regulation, the court accords great weight to PERS['s] interpretation." (*Prentice v. Board of Administration* (2007) 157 Cal.App.4th 983, 989 (*Prentice*).) In carrying out this review, we construe ambiguous or uncertain provisions of the PERL liberally in favor of the pensioner. (*City of Fremont v. Board of Administration* (1989) 214 Cal.App.3d 1026, 1033.)

## II. Statutory and Regulatory Background

The PERL establishes CalPERS, a prefunded, defined benefit pension plan for state employees and employees of participating local public agencies. (*Oden v. Board of Administration* (1994) 23 Cal.App.4th 194, 198.) An employee's pension is determined by a formula that takes into account the employee's age at retirement, number of years of service, and final compensation. (*Ibid*.) CalPERS is funded by employer and employee contributions that are calculated as a percentage of the employee's compensation. (*Ibid*.)

" 'Under the PERL, the determination of what benefits and items of pay constitute "compensation" is crucial to the computation of an employee's ultimate pension benefits. The pension is calculated to equal a certain fraction of the employee's "final compensation" which is multiplied by a fraction based on age and length of service. [Citations.] "Final compensation" is the "highest average annual *compensation earnable* by a member during [a specified] period." ' " (*Prentice, supra*, 157 Cal.App.4th at p. 989; accord, *Molina, supra*, 200 Cal.App.4th at p. 64; see § 20630, subd. (b).)

The statutory scheme defines a number of the terms pertinent to this dispute. " 'Compensation earnable' " means "the payrate and special compensation of the member . . ." (§ 20636, subd. (a).) " 'Payrate' " is "the

6

normal monthly rate of pay or base pay of the member paid in cash . . . for services rendered on a full-time basis during normal working hours, pursuant to publicly available pay schedules." (§ 20636, subd. (b)(1).) And " '[s]pecial compensation' " includes "payment received for special skills, knowledge, abilities, work assignment, workdays or hours, or other work conditions." (§ 20636, subd. (c)(1).) However, it is limited to amounts received by "similarly situated members of a group or class of employment." (§ 20636, subd. (c)(2).)[2]

The statute provides a separate definition of special compensation for "state members," which it is undisputed Hale and Wolf were. For them, special compensation specifically includes, inter alia, "[c]ompensation for performing normally required duties, such as holiday pay, bonuses (for duties performed on regular work shift), educational incentive pay, maintenance and noncash payments, out-of-class pay, marksmanship pay, hazard pay, motorcycle pay, paramedic pay, emergency medical technician pay, Peace Officer Standards and Training (POST) certificate pay, and split shift differential." (§ 20636, subd. (g)(3)(B).) Excluded from the scope of " '[p]ayrate' " and " '[s]pecial compensation' " for state members are "[c]ompensation for additional services outside regular duties, such as standby pay . . . and bonuses for duties performed after the member's regular work shift." (§ 20636, subd. (g)(4)(I).)

---

[2] Subdivision (c)(2) of section 20636 (somewhat ungrammatically) provides: "Special compensation shall be limited to that which is received by a member pursuant to a labor policy or agreement or as otherwise required by state or federal law, to similarly situated members of a group or class of employment that is in addition to payrate. If an individual is not part of a group or class, special compensation shall be limited to that which the board determines is received by similarly situated members in the closest related group or class that is in addition to payrate, subject to [specified limitations]."

A " 'group or class of employment' " is defined as "a number of employees considered together because they share similarities in job duties, work location, collective bargaining unit, or other logical work-related grouping.  A single employee is not a group or class." (§ 20636, subd. (e)(1).) It has been held that an employee may not be a member of more than one group or class.  (*Prentice*, *supra*, 157 Cal.App.4th at p. 993.)

The statutory scheme directs the board of CalPERS to promulgate regulations delineating more specifically and exclusively what constitutes " 'special compensation.' " (§ 20636, subd. (c)(6).)  Pursuant to this authorization, CalPERS promulgated Section 571 of Title 2 of the California Code of Regulations (rule 571).  (*DiCarlo v. County of Monterey* (2017) 12 Cal.App.5th 468, 481–482 (*DiCarlo*).)  Subdivision (a) of rule 571 contains a list that "exclusively identifies and defines special compensation items for *members employed by contracting agency and school employers* that must be reported to CalPERS if they are contained in a written labor policy or agreement." (Italics added.)  The list includes "Holiday Pay," defined as "[a]dditional compensation for employees who are normally required to work on an approved holiday because they work in positions that require scheduled staffing without regard to holidays.  If these employees are paid over and above their normal monthly rate of pay for approved holidays, the additional compensation is holiday pay and reportable to PERS." (Rule 571, subd. (a)(5).)  Subdivision (b) contains standards for evaluating special compensation under subdivision (a);[3] subdivision (c) provides that only items

_____

[3] Specifically, subdivision (b) of rule 571 recites that CalPERS's board has determined that the items of special compensation listed in subdivision (a) are contained in a written labor policy or agreement provided certain requirements are met; are available to all member in the group or class; are part of normally required duties; are performed during normal hours of

8

listed in subdivision (a) have been affirmatively determined to be special compensation and that they are subject to review for conformity with subdivision (b)'s standards; and subdivision (d) provides that if an item of special compensation is not listed in subdivision (a) or is out of compliance with subdivision (b)'s standards, it may not be used to calculate final compensation. The parties disagree as to whether rule 571 applies to the union officers, who are state members rather than members employed by a contracting agency or school.

## III. ALJ and Trial Court Decisions

The ALJ declined to include the holiday pay in Hale and Wolf's final compensation, citing first a requirement that, to be special compensation, the holiday leave credit cash-outs must have been available to all members of their group or class of employment. (See § 20636, subds. (c)(2), (e)(1).) This requirement, the ALJ concluded, was not satisfied. The number of cash-outs Hale and Wolf received was not available to other members of their bargaining unit, who may cash out only four holidays a year and only if funds are available for the cash-out, which they appear not to have been.[4] Hale and Wolf sought to be treated as a separate class or group, but the ALJ rejected their effort: "Although [Hale and Wolf] both worked as union officers at the same office location in Sacramento, and though they were not eligible for certain types of compensation available to other members of Bargaining Unit

_____

employment; are paid periodically as earned; are historically consistent with prior payments for the job classification; are not paid exclusively in the final compensation period; are not final settlement pay; and do not create an unfunded liability above PERS's actuarial assumptions.

[4] At an administrative hearing, CalPERS's counsel told the board that these four days of cash-outs would have been "pensionable" if the rest of the firefighters had been allowed to take them, but that Cal Fire never allowed anyone else to cash out their holiday pay.

9

8, such as overtime pay, they had much in common with other members. They retained the rights and promotional opportunities of other members of Bargaining Unit 8. [They] were paid and promoted during their time as union officeholders consistent with their classification with Cal Fire. The fact that [they] worked in the same union offices in Sacramento exclusively on union matters, and that they worked roughly similar hours without eligibility for overtime pay, does not establish that [they] were a group or class of two, or that they left their classification as firefighters when they became union officers."

The trial court accepted this reasoning, noting that Wolf and Hale's duties as union officers differed from each other, "Mr. Wolf engag[ing] in executive functions while Mr. Hale's work was more 'hands on' "; that both were members of Bargaining Unit 8 and were compensated based on their ranks as battalion chiefs; and that the Agreements guaranteed " 'no loss of compensation (salary o[r] benefits)' " during their full-time release as union officers. The court concluded that grouping them "according to their rank and bargaining unit/compensation makes eminent sense and the Court cannot conclude that [CalPERS] acted arbitrarily."

The ALJ also rejected Hale and Wolf's argument that the holiday cash-outs were special compensation under rule 571, which includes among items of special compensation holiday pay, defined as "[a]dditional compensation for employees who are normally required to work on an approved holiday because they work in positions that require scheduled staffing without regard to holidays." (Rule 571, subd. (a)(5).) According to the ALJ, Hale and Wolf had "established they were required to work on holidays in order to respond to the needs of union members," but not that this was required *because* of the need for scheduled staffing on holidays. That is, according to the ALJ, Hale

10

and Wolf "handled issues during holidays as needed, as the issues arose, without regard to scheduling."

The trial court accepted this reasoning as well, concluding the record supported a determination that the union officers did not work in positions that required scheduled staffing for purposes of rule 571. The court also upheld the finding that their holiday work is best characterized as unpensionable standby pay within the meaning of section 20636, subdivision (g)(4)(I), noting that the union offices were closed on weekends and holidays; that Hale had testified that if he were unavailable when a union member called, the member would have to wait; that they worked about half the weekends and holidays; and that Hale went on vacation to Hawaii and once planned a large Thanksgiving dinner, belying the claim that Hale and Wolf were required to work on a holiday with scheduled staffing. These factors suggested, according to the court, that they were instead working " 'on-call' or 'stand-by.' "

As an alternative basis for its decision, the trial court ruled the cash-outs were not special compensation for purposes of rule 571 because they were not reported to CalPERS as required by that rule. (Rule 571, subd. (a).)

## IV. Analysis

1. Pay for Required Duties

The first question we consider is whether rule 571 applies to this dispute at all. It appears that all parties assumed its applicability both during the administrative proceedings and in the trial court. On appeal, Hale and Wolf raise a new argument: that rule 571 does not govern this case because by its terms it applies only to members employed by contracting agency and school employers, *not* to those employed by the State. Because this is a pure question of law and there is no material dispute about the facts,

11

we may consider this question now. (See *Henderson v. Pacific Gas & Electric Co.* (2010) 187 Cal.App.4th 215, 225–226; *Howard S. Wright Construction Co. v. BBIC Investors, LLC* (2006) 136 Cal.App.4th 228, 242, fn. 13.)

Rule 571's definition of special compensation items is expressly limited to "members employed by contracting agency and school employers," rather than to state employees. (Rule 571, subd. (a).) Subdivision (b) of the rule, setting forth standards for evaluating items of special compensation, and all the remaining subdivisions of Rule 571 refer back to subdivision (a). (*Id.* subds. (b), (c), & (d).)

The rulemaking history set forth in *DiCarlo* sheds light on the reasons local agencies and schools in particular are subject to these precisely delineated standards. Rule 571 was implemented in response to concerns about local agencies engaging in "pension spiking" by adding to the items reported as special compensation. (*DiCarlo, supra,* 12 Cal.App.5th at p. 486; accord, *Tanner v. Public Employees' Retirement System* (2016) 248 Cal.App.4th 743, 756 [predecessor to § 20636 enacted as part of bill to address local contracting agencies' recently uncovered practice of intentionally inflating employees' final compensation].) The *DiCarlo* court explained that the history of rule 571 "demonstrates that it was implemented" to " 'allow local agency and school district employers to report only those items of special compensation that are delineated in regulations adopted by the Board [of Administration]. [¶] Proposed Section 571 would provide an all-inclusive list of special compensation items that <u>must be</u> reported for local agency and school district employees, if authorized by written labor policy or agreement. Section 571 would set forth the <u>standards</u> followed by the Board in determining whether or not items of special compensation qualified for inclusion in the list.' " (*DiCarlo,* at p. 486.)

12

The structure of section 20636 likewise suggests that state workers on the one hand, and local agency and school district workers on the other hand, may be subject to different standards for purposes of measuring special compensation. The directive that CalPERS promulgate rule 571 is found in subdivision (c), which defines the compensation of members in general, but another portion of the statute, subdivision (g), provides that "[n]*otwithstanding subdivision (c)*, 'special compensation' for *state members*" includes, inter alia, "[c]ompensation for performing normally required duties, such as holiday pay." (§ 20636, subd. (g)(3) & (g)(3)(B), italics added.)

This authority leads us to conclude rule 571 does not control whether Hale and Wolf's holiday cash-outs were special compensation. To the extent the administrative and trial court decisions rest on a finding that Hale and Wolf did not work in positions that required scheduled staffing without regard for holidays for purposes of rule 571's definition of holiday pay, they are thus on shaky ground. That is particularly so because the ALJ specifically found that Hale and Wolf's positions *did* require them to work on holidays; the reason the ALJ concluded the holiday pay was not special compensation was that the need for holiday work did not arise from the need for *scheduled* staffing—a requirement found only in rule 571. Without engaging in lengthy analysis, the trial court found no abuse of discretion in this conclusion.

Without rule 571's limitations, it is difficult to square this conclusion with subdivision (g) of section 20636, which defines key terms as applied to state members only. For those members, " 'special compensation' " includes "[c]ompensation for performing *normally required duties*, such as holiday pay . . . ." (§ 20636, subd. (g)(3)(B), italics added.) The record fully supports the finding that responding to the needs of union members whenever calls came

13

in—on holidays or otherwise—was one of Hale and Wolf's normally required duties. Thus, payments the two men received to cash out their holiday leave credits was compensation for performing their normal duties and met the statutory definition of " 'special compensation' for state members." (§ 20636, subd. (g)(3).)

At oral argument, CalPERS suggested that, even if section 571 is not directly applicable, we should be guided by its definition of "holiday pay" in considering the meaning of that term for state members. But the precise issue before us is not whether the cash-outs are "holiday pay" under any given definition; it is whether they are "special compensation." As to state workers, the Legislature has determined that one form of special compensation is "[c]ompensation for performing normally required duties," with holiday pay as one example. (§ 20636, subd. (g)(3)(B).) Our decision rests on the fact that Hale and Wolf's work on holidays was a part of their normally required duties, not on any particular definition of "holiday pay."

Disputing this result, CalPERS relies on *City of Pleasanton v. Board of Administration* (2012) 211 Cal.App.4th 522 (*City of Pleasanton*) to argue the union officers were at best " 'on-call' " or " 'on stand-by' " during holidays and weekends, but that case is readily distinguishable. The question there was whether a portion of the compensation of a division chief in a city fire department—something called " 'standby pay' " in his labor agreement—should be considered special compensation for purposes of his CalPERS retirement allowance. (*City of Pleasanton*, at p. 526.) The division chief worked a standard 40-hour workweek, Monday through Friday, and was off work on the city's regular holidays, but he was assigned to a back-up schedule requiring him to be available to report for emergencies, as necessary, during certain times. (*Id*. at pp. 526–527.) The fire department's

14

compensation plan granted division chiefs with a standby schedule an additional 7.5 percent of their salary in " 'Standby Pay.' " (*Id.* at p. 527.) In administrative proceedings, CalPERS concluded the standby pay did not constitute special compensation because it was paid for services rendered outside the employee's normal working hours, and it could not be construed as holiday pay, training premium pay, or shift differential pay. (*Id.* at p. 529.)

The trial court granted the employee's petition for writ of mandate, and the Court of Appeal reversed. (*City of Pleasanton*, *supra*, 211 Cal.App.4th at pp. 525, 530–531.) In so doing, it pointed to the evidence that the 7.5 percent pay increment was intended to compensate division chiefs for assigned duties in excess of their normal 40-hour workweek, at times the employee testified he was " 'pretty much on call.' " (*Id.* at pp. 537–538.) The appellate court rejected the employee's contention that the times he was required to be available as a backup division chief were part of his " 'normal working hours,' " because unless called in, the employee could be at home every evening during the week and all day on weekends and holidays, and the record did not disclose how frequently or infrequently he had to work during those times. (*Id.* at p. 538.) In the court's view, the 7.5 percent pay increment was better characterized as compensation for being *available* to work on a standby basis *outside* his normal working hours, rather than compensation for working *during* normal working hours. (*Id.* at p. 539.) The court also went on to conclude the compensation did not qualify as holiday pay for purposes of rule 571, explaining that although the employee might occasionally have to work on a holiday if he was on backup and was called in to relieve someone else, he was not " 'normally required to work' on holidays." (*City of Pleasanton*, at p. 540.)

15

The situation here is fundamentally different from that in *City of Pleasanton*. Hale and Wolf *were* required to work on holidays, and there is ample evidence that they were routinely required to carry out their duties as union officers regardless of the day of the week or whether it was a holiday. They did not, unlike the petitioners in *City of Pleasanton*, work a standard 40-hour per week schedule. (Compare *City of Pleasanton*, *supra*, 211 Cal.App.4th at p. 538.) The trial court expressed skepticism that neither employee was able to take a holiday off during their ten years as union officers, but there is no indication Cal Fire ever questioned Hale or Wolf's accounting of their work time. Ironically, part of the evidence CalPERS uses in an attempt to show they were able to take holidays off is the example that Hale had to spend much of a Thanksgiving Day, when he had hoped to enjoy a gathering at his home, on the telephone dealing with an emergency. At most, that example cuts both ways, and it does not show the officers could regularly take holidays free of work obligations. In any event, *City of Pleasanton* involved the employee of a local agency, rather than a state member, so the stricter standard of Rule 571 governed in that case. (*Id*. at p. 525.)

2. Available to All Members

As a separate basis for rejecting Hale and Wolf's claim that the holiday cash-outs were special compensation, the ALJ explained that the cash-outs were not available to all members of their group or class of employment: although Hale and Wolf worked as union officers in the same office in Sacramento and were not eligible for certain types of compensation available to other members of Bargaining Unit 8, they had other things in common with members of their unit. For instance, they retained the same rights and promotional opportunities as other members of the bargaining unit, and they

16

were paid and promoted consistent with their classification with Cal Fire. Rejecting Hale and Wolf's attempt to characterize themselves as their own group or class of two, the ALJ explained that they did not lose their characterization as firefighters when they became union officers and that an employee may be a member of only one group or class. (See *Prentice, supra*, 157 Cal.App.4th at p. 993.) The trial court did not fault this analysis, concluding it made "eminent sense" to decline to treat Hale and Wolf as a class of two.

We do not dispute the characterization of Hale and Wolf's "group or class" as Bargaining Unit 8, but we are not persuaded that ends the inquiry. One of the limitations on special compensation is that it be received by "*similarly situated* members of a group or class of employment." (§ 20636, subd. (c)(2), italics added.) The ALJ and the trial court effectively wrote the italicized words out of the statute, concluding qualifying special compensation must be available to "all members of their group or class of employment."[5] But if there is one thing this record makes clear, it is that Hale and Wolf's situation was different from that of other members of Bargaining Unit 8. They were the only two firefighters serving as union officers at the time; they worked in a different location from other members; they were not allowed to carry out firefighting duties; they were not eligible for overtime; and their work schedule differed from other members of the unit. Their different situation was recognized in the Agreements, which treated their holiday pay cash-outs and carry-over differently than that of other members of the bargaining unit.

_____

[5] That may be in part because rule 571, which we have concluded does not apply to state members, lacks the "similarly situated" language in its recitation of what qualifies as special compensation. (Compare § 20636, subd. (c)(2) with Rule 571, subd. (b)(2).)

As Hale and Wolf point out, the record shows that the holiday cash-outs are not the only item of special compensation that is not available to *all* members of the bargaining unit at any given time, but only to those whose job duties require it.  For instance, for state members, one item of special compensation for performing normally required duties is hazard pay (§ 20636, subd. (g)(3)(B)), but under the Agreements a "HAZMAT" incentive is available only to Unit 8 members assigned to a HAZMAT response unit on a full-time basis, or other employees at the discretion of the Unit Chief.  And under the Agreements, paramedics in certain job classifications are entitled to an annual "pay differential" not available to those who do not serve in those paramedic classifications, a differential that is treated as compensation for purposes of retirement contributions.  We are not persuaded that the union officers' holiday cash-outs must be available to all members of Unit 8, regardless of the duties of their particular assignment—put another way, regardless of whether they are similarly situated—to be considered special compensation for purposes of section 20636.

We are mindful of the general rule that we accord great weight to CalPERS's interpretation of the PERL and its own regulations, unless clearly erroneous.  (*Prentice*, *supra*, 157 Cal.App.4th at p. 989.)  But we may not abdicate our duty to apply our independent judgment to legal issues.  (See *Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 8.)  We accord greater weight to a consistent interpretation, particularly if long-standing, and we do not defer to one that is " 'vacillating.' "  (*Id*. at p. 13.)  The parties draw our attention to no consistent or long-standing determination by CalPERS either that state members are subject to the limitations of rule 571 or that, independent of rule 571, holiday cash-outs in the circumstances before us are not properly included in pension calculations.

Indeed, a recent nonprecedential decision by CalPERS, concluding in a different factual context that rule 571 does not apply to state members, suggests the opposite.[6] Thus, the general rule of deference does not assist CalPERS in this case.

The facts before us are largely undisputed. On this record, we conclude as a matter of law that Hale and Wolf's holiday cash-outs were special compensation and must be included in calculating their pensions.[7]

## DISPOSITION

The judgment is reversed. The trial court is directed to issue a new order granting Hale and Wolf's petition for writ of administrative mandamus. Appellants shall recover their costs on appeal.

TUCHER, P.J.

WE CONCUR:

FUJISAKI, J.
PETROU, J.

*Hale et al. v. California Public Employees' Retirement System* (A161758)

---

[6] We grant the request of Hale and Wolf for judicial notice of this decision, *In the Matter of the Appeal Regarding the Final Compensation Calculation of Thomas Blanco and Department of Corrections and Rehabilitation, Respondents*, Agency Case No. 2020-1209, OAH Case No. 2021030825, April 25, 2022. Although the decision is of limited value, both because it is not precedential and because it was not before the trial court—and it is not necessary to our decision—it indicates CalPERS has taken inconsistent positions on whether state members are subject to rule 571.

[7] We do not address whether Hale and Wolf's pension contributions must be adjusted retroactively. CalPERS makes no claim on appeal that Cal Fire's failure to report Hale and Wolf's holiday cash-outs in a timely manner provides an independent basis to exclude these amounts from their pension calculations.

19

Trial Court:      City and County of San Francisco Superior Court

Trial Judge:      Hon. Ethan P. Schulman

Counsel:      Messing Adam & Jasmine, Gary M. Messing, Gregg McLean Adam and Lian Balciunas Cockrell for Petitioners and Appellants

                      Matthew G. Jacobs, General Counsel, California Public Employees' Retirement System, Elizabeth Yelland Assistant Chief Counsel, California Public Employees' Retirement System, and John Shipley Senior Attorney, California Public Employees' Retirement System for Defendant and Respondent