Filed 10/14/14

**CERTIFIED FOR PARTIAL PUBLICATION*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| PALOMAR GRADING & PAVING, INC., | |
| Plaintiff and Respondent, | G049907, G049910 |
| v. | (RIC508520) |
| WELLS FARGO BANK, N.A., et al., | |
| Defendants and Appellants. | O P I N I O N |
| [And eight other cases.**] | |

Appeal from a judgment of the Superior Court of Riverside County, John Vineyard, Judge.  Judgment affirmed in part and reversed and remanded in part.

---

\* Pursuant to California Rules of Court, rule 8.1110, only Part III.J. of this opinion is certified for publication.

\*\* TNT Grading Inc. v. Wells Fargo Bank, N.A. (No. RIC495881); Cass Construction v. Wells Fargo Bank, N.A. (No. RIC496900); Advance Contracting v. Wells Fargo Bank, N.A. (No. RIC497777); Murrieta Oaks v. Wells Fargo Bank, N.A. (No. RIC501042); R3 Contractors v. Wells Fargo Bank, N.A. (No. RIC507764); Republic Intelligent v. Wells Fargo Bank, N.A. (No. BAC011002); Independent Electric v. Wells Fargo Bank, N.A. (No. BAC010605);  X-C Hub Construction v. Wells Fargo Bank, N.A. (No. BAC010737).

California Appellate Law Group, William N. Hancock, Ben Feuer; Fidelity National Law Group and James A. Moss for Defendant and Appellant Wells Fargo Bank.

Manning & Kass, Ellrod, Ramirez, Trester, Darin L. Wessel and John D. Marino for Defendant and Appellant Kohl's Department Stores.

Stuart D. Hirsch for Plaintiff and Respondent Palomar Grading & Paving.

Wheatley, Scott & Company and Raymond D. Scott for Plaintiff and Respondent R3 Contractors.

Law Offices of Gregory J. Hout and Gregory J. Hout for Plaintiff and Respondent Cass Construction.

## I. INTRODUCTION

The Great Recession hit Southern California's Inland Empire region – roughly defined as Riverside and San Bernardino counties – particularly hard. This is one of a number of cases which have, in the aftermath of that recession, finally made their way to this court. The appeal stems from financial difficulties encountered in the construction of a Kohl's department store in Beaumont. The developer of the store was Inland-LCG Beaumont, LLC (Inland) a Utah firm and the general contractor a Texas firm, 361 Group Construction Services, Inc. (361). Somewhere in the process of construction the money dried up and 361 refused to pay its subcontractors for work they had done. Those subcontractors included Cass Construction (Cass), TNT Grading Inc. (TNT), Palomar Grading & Paving (Palomar Grading) and R3 Contractors (R3).

These four subcontractors recorded mechanic's liens and sued to foreclose those liens. With one exception they obtained judgments of foreclosure. The one exception was TNT, who, by the time of the trial to foreclose its mechanic's lien, was a suspended corporation and thus unable to prosecute an action.

The two current owners of the property, Kohl's and Wells Fargo, have appealed from the judgments obtained by the three successful subcontractors, Cass, R3

2

and Palomar Grading.  Kohl's purchased the particular parcel on which its store sits just about a month after construction began, and Wells Fargo Bank is the successor to the construction lender Wachovia Bank, itself a casualty of the Great Recession.  Wachovia became the owner of the other two parcels of the tract when it foreclosed on Inland.

Given that there are two separate appeals arising out of no less than three separate foreclosure actions, this consolidated appeal presents something of an organizational challenge.  We have identified no less than 10 discrete issues now before us, all involving the operation of California's mechanic's lien laws.  We have decided to take these issues in the order of the natural progression of mechanic's liens – soup to nuts as it were – from the initial filing of a preliminary notice to the final amount of interest to be applied to a foreclosure judgment.  Here is a brief summary of our conclusions.  Appellants go 1 for 10:

(a)  The fact Cass did not name Kohl's on its preliminary notice was not fatal to the later foreclosure of its mechanic's lien, because Kohl's wasn't an owner or a reputed owner at the time Cass recorded its preliminary notice.

(b)  The fact Cass did some work after it recorded its mechanic's lien was similarly not fatal to the foreclosure of its lien, because the work it did was all pursuant to its subcontract with 361.

(c)  Cass's failure to name either Kohl's or Wells Fargo on its mechanic's lien was also not fatal, because Cass had no actual knowledge either Kohl's or Wells Fargo was an owner of land in the tract at the time of the recording of Cass's mechanic's lien.

(d)  R3's listing of an address that was not, strictly speaking, the address of Kohl's store, was not fatal to its lien on the tract (which includes the store), because the address it gave was sufficient for identification of the whole tract.

(e)  Cass and R3 filed their suits to foreclose their liens timely even though they later had to add Kohl's and Wells Fargo as Doe defendants, because at the time of

3

filing their suits neither had actual knowledge Kohl's or Wells Fargo was an owner in the tract.

(f) Cass can collect an amount in its foreclosure action in excess of the amount it listed on its lien because the excess amount was pursuant to its contract and incurred prior to the recording of the lien.

(g) The trial court did not err in including within Cass's lien foreclosure amount a sum Cass owed to TNT, even though by the time of trial TNT was a suspended corporation, because TNT, at the time of the judgment, did not qualify as a "claimant" under the statute which requires deduction of amounts owed to "claimants" in figuring lien judgments.

(h) Given the unitary nature of the project, even though it involved three contiguous parcels, the trial court was within its discretion *not* to allocate Cass's and R3's lien judgments between the one parcel owned by Kohl's and the two parcels owned by Wells Fargo.

(i) In light of our decision on the allocation question, lien amounts were susceptible of precise calculation, therefore both Cass and Palomar Grading can collect "prejudgment" interest on their liens. (R3 waived its right to prejudgment interest and there is no issue on appeal as regard to that.)

But it's not a complete shutout.

(j) The amount of that prejudgment interest is properly figured at 7 percent, i.e., the interest used is for obligations imposed by law, not 10 percent, the interest rate for obligations voluntarily undertaken by contract, because neither Kohl's nor Wells Fargo entered into any contract with any lien claimant. Rather, their obligation results because the law imposes it on them.

## II. FACTS

The project, as it came into being in the spring of 2007, involved the construction of a Kohl's department store on parcel 2 of a three-parcel tract, the technical

4

legal description of which is all subsumed within "Parcel Map No. 35266." When we refer to "the tract" or "the property" we mean the land encompassed by that particular Parcel Map number.

The "tract" is easily conceptualized: A large rectangle, parcel 2, sits next to two smaller rectangles, parcels 1 and 3. In terms of the actual work done by Cass and R3, there was no differentiation between the parcels. For them, it was all one big rectangle. In this appeal, no issues are raised as to the reasonableness of the actual work done by Cass and R3, so we need not describe that work in detail. It is enough to say it entailed various forms of grading, infrastructure, sewer and utility work.

The issues raised in this appeal require chronological treatment. But before we set out that chronology, we need to point out that certain events took place out of the sequence one might naturally expect. Inland had been planning the Kohl's department store project before actually acquiring the tract. It had also lined up Wachovia Bank as its construction lender, and had engaged 361 as its general contractor all prior to its actually owning the property. In turn, 361 formally subcontracted with Cass prior to Inland's formal acquisition of the tract, and it was more than a month *after* work got started that Inland sold off parcel 2 of the tract to Kohl's. Kohl's doesn't always own the land on which its stores sit, but it decided in this case to own parcel 2.

These chronological anomalies help explain the origin of some of the technical issues raised by Kohl's, and Wells Fargo as Wachovia's successor. The lien claimants here began work *prior* to the current owners of the tract, Kohl's and Wells Fargo, taking title. The lien claimants received their information about ownership interests in the tract from the entity they dealt with, 361, which got its information from Inland. That said, here are the events in the case, told in strict, if somewhat prosaic, chronological order:

Prior to March 2007: The tract was owned by Loma Linda University.

5

March 20, 2007: While the tract was still owned by Loma Linda, Inland signed a contract with Kohl's to develop a Kohl's store on the tract. The deal involved Kohl's paying 64.88 percent to Inland for the development, with Inland paying the balance itself.

March 21, 2007: Cass commenced grading and related work.

March 22, 2007: Cass served its preliminary notice about the possibility of a mechanic's lien on (a) Wachovia Bank, the construction lender, (b) Inland, as owner of the tract, and (c) on 361, as the original contractor hired by Inland. Kohl's was not served. However, as of March 22, Inland was still not *yet* the owner of the tract. That would not happen until:

March 30, 2007: On this date Inland received a grant deed from Loma Linda. Concomitantly, a deed of trust in favor of Wachovia as construction lender was also recorded that very day.

May 10, 2007: Cass formally entered into a subcontract with 361 for grading and infrastructure of the tract.

May 17, 2007: Kohl's became the owner of parcel 2 via a grant deed from Inland.

Summer-Fall 2007: Construction work proceeded on the Kohl's store.

January 21, 2008: Cass recorded a mechanics lien. The lien gave "Kohl's Development [¶] First Street and Commerce Way [¶] Beaumont, California" as the description of the land. The lien listed $1,835,999.59 as the amount, and "LCG Beaumont, LLC, 1850 Sidewinder Drive, 2nd Floor, Park City, UT, 84060" as the owner. Kohl's was not listed as an owner.

January 26 to April 24, 2008: Cass did additional work on the tract, the nature of which is disputed by the parties. The trial court would impliedly find there was substantial evidence all the work was done pursuant to Cass's existing contract. (More details on that point are given in Part III.B.)

6

February 21, 2008: TNT, not having been paid by Cass, filed a mechanic's lien for $608,018.39 on the tract.

February 29, 2008: 361 signed a contract with R3 to do certain offsite work.

March 15, 2008: R3 recorded a preliminary notice, naming 361 as the entity who contracted for the work, Inland as owner of the property, and Wachovia as construction lender.

April 8, 2008: Cass filed an action (RIC 496900) against Inland and 361 for various causes of action, including a fifth cause of action for foreclosure of its mechanic's lien. Cass did not name either Wachovia or Wells Fargo, or Kohl's, as defendants. The fifth cause of action for foreclosure encompassed Does 1 though 90 as either owners *or* persons having an interest in, the Kohl's property. The sixth cause of action, involving subdivision improvement bonds (an issue not before us in this appeal) included as defendants Does 91 though 100.

May 1, 2008: Cass filed an amendment to its complaint, naming Kohl's as Doe 11, i.e., a possible owner.

June 6, 2008: R3 completed its last day of work.

June 9, 2008: R3 recorded its own mechanic's lien. That set forth "1491 E. Second Street Market Place, Beaumont, CA 92223" as a description of the land, and "Inland-LCG Beaumont, LLC, 1850 Sidewinder Dr., 2nd Floor, Park City, UT 84060" as the owner. The lien gave $611,374.14 as the amount. There is no mention of either Wachovia or Kohl's.

June 16, 2008: Cass filed an amendment to its complaint adding Wachovia as Doe 91. As noted, Doe 91 was not one of the "owner" or "had an interest in" Does – those were Does 1 though 40. (Doe 91 was only involved in the subdivision improvement bond cause of action.)

7

August 2008: TNT filed suit (RIC 495881) against Cass, Inland and others because it was never paid for its work, alleging $608,018.39 was owed.

September 5, 2008: R3 filed its complaint against 361 and Inland (RIC 507764). The third cause of action for foreclosure of the mechanic's lien listed Inland and Does 11 through 20 as defendants and owners of the property. Neither Kohl's nor Wachovia was named in the original complaint.

September 17, 2008: Palomar Grading filed its original complaint (RIC 508520), naming Wachovia as a lender having an interest in, the property.

December 31, 2008: Wells Fargo formally took over failing Wachovia Bank.

About eight months went by.

August 20, 2009: R3 filed a first amended complaint in which Inland and Does 1 through 18 were alleged to be defendants in a lien foreclosure action. Neither Wachovia, nor Wells Fargo, nor Kohl's were named defendants.

About nine months went by.

May 24, 2010: Cass filed an amendment to its complaint naming Wells Fargo as Doe 41.

November 2, 2010: Inland lost its parcels in foreclosure to Wells Fargo, who became the owner of parcels 1 and 3.

November 5, 2010: Wells Fargo filed an answer to Cass's complaint (RIC 496900) in what by then had become a consolidated case that included TNT's action (RIC 495881 – the lead case) and Palomar Grading's action (RIC 508520)). By September 27 2011, the jumbo consolidated case also included R3's action (RIC 507764) and the actions of seven other subcontractors whose work on the project is not otherwise relevant to this appeal.

A little more than eight months went by.

8

July 12, 2011:  R3 filed an amendment to its first amended complaint naming Kohl's as Doe 12.  Recall that Doe 12 was one of the foreclosure defendants.

February 22, 2012:  In the course of the trial court's consideration of various motions in limine, Kohl's counsel informed the court that as of February 17, 2012, TNT was a suspended corporation.

February 22 through March 1, 2012:  The case was tried.

March 23, 2012:  The trial court entered judgment for Palomar Grading on its cause of action, for $178,677.28.  Of that, $49,379.83 was calculated to be interest at 10 percent for the three years and 299 days since it recorded its complaint.

May 25, 2012:  The trial court entered a judgment for Cass and R3, ordering the property to be sold, with Cass to receive $2,896,663.40 and R3 to receive $415,061.89.  Each amount was based on prejudgment interest calculated at 10 percent.

June 15, 2012:  R3 gave notice of entry of the judgment in its favor.

June 18, 2012:  Wells Fargo filed a notice of appeal from the March 23, 2012, judgment for R3.:

July 3, 2012:  Kohl filed a notice of motion for new trial or alternatively to set aside the judgment.

July 9, 2012:  Wells Fargo filed its notice of appeal from the May 25, 2012 judgment in favor of Cass and R3.

August 20, 2012:  The trial court denied Kohl's motions for new trial or to set aside the judgment.

September 12, 2012:  Kohl's filed its notice of appeal from the judgment and the denials of its post-trial motions.

9

## III.  DISCUSSION

California's mechanic's lien law used to occupy sections 3082 through 3267 of the Civil Code.[1]  Now it occupies sections 8000 through 9566.  The change was effective July 1, 2012.  The Legislature specifically provided that the old law would govern for mechanic's liens recorded before that date.  (See § 8052.)  So when we cite or discuss a mechanic's lien statute in the 3000's of the Civil Code, it is "old law."  We will dispense with the repetitive adjective "former" in front of those citations or references.

A.  *Did Cass Forfeit Its Mechanic's Lien as Applied to Kohl's, by Failing to Mention Kohl's in Its Preliminary Notice?  No.*

Kohl's makes an in passim argument in its brief  to the effect that because Cass *knew* the project would "involve" Kohl's, it was therefore *required* to name Kohl's in its preliminary notice.  This is easily the weakest of all of Kohl's arguments.  The text of the preliminary notice statute, section 3097, only required the preliminary notice to be served on the "owner or reputed owner."[2]  Kohl's fit neither description at the time of the preliminary notice.  Cass filed its preliminary notice on March 21.  Kohl acquired title on May 17.  Section 3097 did not require inclusion of "likely future owners," and the phrase "reputed owner" hardly encompasses mere possible future owners.

B.  *Was Cass's Mechanic's Lien Void Because Cass Performed Work After Recording the Lien?  No.*

Kohl's argues that because Cass's own records showed some work performed after January 26, 2008, the date of its recording its lien, the lien was

---

[1]    All undesignated statutory references in this opinion are to the Civil Code *except* any reference to "section 1203a," "section 1203," "section 1196.1" or "section 474."  Those statutory references are to the Code of Civil Procedure.

[2]    In pertinent part section 3097, subdivision (a) read:  "Except [for a number of situations not relevant to this case], every person who furnishes labor, service, equipment, or material for which a lien or payment bond otherwise can be claimed under this title, or for which a notice to withhold can otherwise be given under this title, *shall*, as a necessary prerequisite to the validity of any claim of lien, payment bond, and of a notice to withhold, cause to be given *to the owner or reputed owner*, to the original contractor, or reputed contractor, and to the construction lender, if any, or to the reputed construction lender, if any, a written preliminary notice as prescribed by this section."  (Italics added.)

10

"premature and void." Cass responds that this work was "punch list" work. The dictionary definition of "punch list" is a list of small repairs or unfinished work that must be completed to *fulfill* a contract.[3]

But the issue is a little more complicated than the parties present it. First, the statute governing the first date to record a mechanic's lien was section 3115. The key phrase in that statute was "after he completes his contract."[4] The lead case interpreting that phrase in section 3115 is *Howard S. Wright Const. Co. v. BBIC Investors, LLC* (2006) 136 Cal.App.4th 228, which reversed a trial court's judgment dismissing a lien foreclosure action. The trial court had based its conclusion on the rationale that the subcontractor's lien was premature and therefore void. That was error on the trial court's part. But the *reason* the trial court was wrong was not because work done after recording a lien is irrelevant. Rather, the appellate court said the lien was still good because the general contractor had *breached the contract on the day before* the subcontractor filed its mechanic's lien. (See *id.* at p. 243 [because of general contractor's "anticipatory breach" of contract, subcontractor completed its contract within meaning of section 3115 on June 19, so "the recording of its claim of lien on June 20 was not premature"].)[5]

In reversing, the *Howard S. Wright* court set down two black-letter statements of law. Alas those two statements are in tension with each other. First, the *Howard S. Wright* court articulated a "substantial" completion rule, saying, "[A] contractor completes the contract upon substantial performance of its obligations."

---

3    From the current online version of the Oxford English Dictionary: "a list of items such as small repairs, unfinished work, etc., that must be completed in order to fulfil a construction contract, typically created at the end of a project." (See http://www.oed.com/view/Entry/154558?redirectedFrom=punch+list [as of July 2, 2014].)

4    Section 3115 provided in its entirety: "Each original contractor, in order to enforce a lien, must record his claim of lien after he completes his contract and before the expiration of (a) 90 days after the completion of the work of improvement as defined in Section 3106 if no notice of completion or notice of cessation has been recorded, or (b) 60 days after recordation of a notice of completion or notice of cessation."

5    A case that might be read for a per se irrelevance rule, *Lewis v. Hopper* (1956) 140 Cal.App.2d 365, another "punch-list" case, was, as the *Howard S. Wright* court noted, only a statute of limitations case and did not interpret section 3115 at all. (See *Howard S. Wright, supra*, 136 Cal.App.4th at p. 240, fn. 5.)

11

(*Howard S. Wright, supra*, 136 Cal.App.4th at p. 240.)  But then the court turned around and used the categorical word "all" in interpreting section 3115:  "Simply put, a contract is complete for purposes of commencing the recordation period under section 3115 when *all* work under the contract has been performed, excused, or otherwise discharged."  (*Howard S. Wright, supra*, 136 Cal.App.4th at p. 241.)

We need not resolve the tension between "substantial" and "all" in this case, however.  There was evidence from Cass's president, Kyle Nelson, that 361 and Cass agreed to terminate Cass's remaining work "in mid-to-late January" 2008.  Cass gets the benefit of the doubt on the difference between "mid" and "late," so we may draw the reasonable inference from that testimony that the contract had been breached *prior* to the recording of the lien on January 21, 2008.  Given that inference, the case comes squarely within the rule of decision of *Howard S. Wright* – the contract was over by January 21, 2008 when Cass filed its lien, ergo the lien was not premature and not void.

C. *Did Cass and R3 Forfeit Their Mechanic's Liens as Applied to Kohl's by Failing to Name Kohl's in their Actual, Recorded Liens?  No.*

Neither Cass nor R3 named Kohl's as an owner in their liens, despite Kohl's ownership of parcel 2 within the tract by the time those liens were recorded.  Accordingly Kohl's argues the liens are void because of the omission.

The statute setting out the requirements for a mechanic's lien was section 3084, which was essentially definitional.  All it did was explain what a mechanic's lien *is*.  As with the preliminary notice statute, the key phrase was "owner or reputed owner, if known."[6]

---

6     Here is the text of section 3084 in its entirety:
"(a) 'Claim of lien' means a written statement, signed and verified by the claimant or by the claimant's agent, containing all of the following:
"(1) A statement of the claimant's demand after deducting all just credits and offsets.
"(2) The *name of the owner or reputed owner, if known*.
"(3) A general statement of the kind of labor, services, equipment, or materials furnished by the claimant.

The phrase "if known" is obviously a different concept from "if know*able*." Thus *Grinnell Fire Protection System Co. v. American Sav. & Loan Assn.* (1986) 183 Cal.App.3d 352 squarely held that title searches are not necessary for a valid mechanic's lien: "Furthermore, as [the general contractor] points out, other sections of the mechanic's lien law contain language indicating that *the Legislature did not intend to impose on the lien claimant the burden and expense of conducting a title search on the property against which the lien is filed.* Thus, section 3084 provides that a claim of lien must contain 'the name of the owner or reputed owner, if known,' and section 3097 similarly requires service of the preliminary 20-day notice on the 'owner or reputed owner.' . . . It appears by the language used in these sections that the Legislature recognized that *the lien claimant might not have complete and accurate information on the ownership of the property in question*, and this recognition makes it improbable that the Legislature expected the materialman to conduct a complete and accurate title search to ascertain who owns the property." (*Grinnell Fire, supra*, 183 Cal.App.3d at pp. 361-362, italics added.)

The question still remains whether Cass or R3 actually knew that Kohl's was an owner of a parcel within the tract when they filed their mechanic's liens, since the statutory phrase "if known" suggests at least a requirement of listing those owners a lien claimant *actually knows* to be owners. However, that is a substantial evidence question on which the trial court impliedly found against Kohl's. And there was indeed substantial evidence to support the trial court's finding neither Cass nor R3 *knew* Kohl's was an owner. As to Cass, its president Kyle Nelson testified he didn't know Kohl's was an owner when Cass recorded its lien. The trial court believed him. That was enough.

"(4) The name of the person by whom the claimant was employed or to whom the claimant furnished the labor, services, equipment, or materials.

"(5) A description of the site sufficient for identification.

"(b) A claim of lien in otherwise proper form, verified and containing the information required by this section shall be accepted by the recorder for recording and shall be deemed duly recorded without acknowledgment." (Italics added.)

(E.g., *Major v. Western Home Ins. Co.* (2009) 169 Cal.App.4th 1197, 1208 ["The testimony of a single credible witness – even if a party to the action – may constitute "'substantial evidence.'"].) Ditto as to R3. Its accounts receivable and office manager, Linda Goral, similarly testified that R3 didn't know of any owner of the tract other than Inland prior to August 20, 2009. R3's mechanic's lien was filed in June 2008.

D. *Was R3's Not Listing the Right Address for the Kohl's Store Fatal to Its Mechanic's Lien as to Kohl's? No.*

Section 3084 (quoted in footnote 6 above) merely required that a mechanic's lien provide a description of the property "sufficient for identification." Here, Kohl's argues that because R3 specified "14*91* E. Second Street" in its lien, when the address of the Kohl's store on parcel 2 of the tract is 14*79* E. Second Street, that its mechanic's lien is fatally defective.

As it turns out, the 91 address is physically a little closer to the 79 address than one might guess. The 1491 address is in the upper northwest corner of parcel 1, and readers will recall that parcel 1 is immediately beside the larger parcel 2 owned by Kohl's. Parcel 1 actually has no building on it, but does have some curb and gutter work by R3. Even so, there is no question that 1491 is an address that is not actually *on* parcel 2 of the tract.

According to Kohl's, by listing an address that did not include parcel 2 – the only property actually owned by Kohl's – R3's mechanic's lien necessarily *excluded* parcel 2 from its ambit. The theory is a variation of the linguistic canon of expressio unius exclusio alterius, and a few old cases relied on by Kohl's, particularly *Fernandez v. Burleson* (1895) 110 Cal. 164 and *D.I. Nofziger Lumber Co. v. Waters* (1909) 10 Cal.App. 89, used that linguistic principle to conclude that the property descriptions in those cases were fatal to the liens involved. (See *Fernandez, supra*, 10 Cal. at p. 167 ["the monuments and lines by which the property is said in the notice to be 'particularly described' cannot be expunged from the notice, but must be read as part of it; so read it is

14

misleading in a particular where it should be substantially true"]; *D.I. Nofziger, supra*, 10 Cal.App.at p. 91 ["Indeed, the accurate and certain description in the notice of lien upon lot 18 in block 5 necessarily precludes the idea that such description could have reference to or afford any means for identifying property in some other block in said tract."].)

But these old cases do not give an accurate picture of the current state of the law bearing on whether a mechanic's lien sufficiently identifies the property. The issue of the accuracy of a property description has been problematic in California mechanic's lien case law for more than 125 years, and the results have not always been consistent. (See *Wand Corp. v. San Gabriel Valley Lbr. Co.* (1965) 236 Cal.App.2d 855, 860 ["reconciliation of all decisions in this field is perhaps impossible"].[7])

Many of the early cases involved liens against mining claims. A very early case, *Penrose v. Calkins* (1888) 77 Cal. 396, illustrates what is probably the low point in absolutely insufficient descriptions. There, because a "scrivener" apparently forgot the balance of the legal description, the mechanic's lien literally only specified a "certain lot and parcel" in Nevada County, and then forgot to describe that lot and parcel. (*Ibid*.) Obviously just saying the liened land is somewhere in a given county is not sufficient.

The two old cases on which Kohl's relies, namely *D.I Nofziger* and *Fernandez*, however, are not good law because of an intervening statute, section 3261, whose predecessor was first enacted in 1907 as section 1203a of the Code of Civil

---

[7]     Strictly speaking, *Wand* did not involve a failure to accurately describe the property; rather it involved a mistake in the mechanic's lien form as to who, precisely, authorized the work to begin with. The lien claimant mistakenly wrote "claimant" when it should have inserted the name of "Walter H. Sargent, Inc.," the entity who contracted with the claimant for the work on the office building in the case. (See *Wand, supra*, 236 Cal.App.2d at pp. 856-857.) *Wand*, however, is perhaps the most thoughtful opinion one is likely to encounter in the small eddy of cases bearing on disputed property descriptions. There, Justice Kaus (then of the Court of Appeal) explored the case law to date, and recognized that "the bewildering array of cases in this field" might at least be analyzed by how those cases grappled with a particular statute, then section 1196.1 of the Code of Civil Procedure, which said mistakes in certain particulars in mechanic's liens would definitely *not* invalidate them. (See *id.* at pp. 859-861 [noting the "profound effect" which the statute has had "on the manner in which our decisions" have interpreted the requirements for a valid mechanic's lien].) Our decision today aspires to follow in Justice Kaus's footsteps by, as in *Wand*, focusing on the effect of the latter-day iteration of section 1196.1, namely section 3261.

15

Procedure.[8]  Section 3261 provided in pertinent part:  "No *mistake or errors in the . . . the description of the property against which the lien is recorded, shall invalidate the lien*, unless the court finds that such mistake or error in the statement of the demand, credits and offsets, or of the balance due, was made with the intent to defraud, or that an innocent third party, without notice, direct or constructive, has since the claim was recorded become the bona fide owner of the property, and that the notice of claim was so deficient that it did not put the party on further inquiry in any manner."  (Italics added.)

Because section 3261's predecessor statute was enacted in 1907, it obviously had no effect on the 1895 *Fernandez* case.  Nor did it have any bearing on the 1909 *D.I. Nofziger* case.  *D. I. Nofziger* came to the court based on facts occurring prior to the 1907 statute.  In fact, *D.I. Nofziger* explicitly said the case was decided on prior law.  (See *D.I. Nofziger, supra*, 10 Cal.App. at p. 91 ["We forebear any discussion of the effect which section 1203a (Stats. 1907, p. 858) might have upon the case, for the reason that all proceedings in the action were had prior to the enactment of said section."].)

The reliance by *Fernandez* and *D.I. Nofziger* on pre-1907 would be the end of the matter, except for a more recent case – well, as "recent" as World War II – *Hayward L. Etc. Co. v. Pride Etc. M. Co.* (1941) 43 Cal.App.2d 146 (*Hayward Lumber*).  *Hayward Lumber* was not decided on pre-1907 facts, but it still held a description to be fatally defective *despite* section 3261's predecessor being on the books at the time.  In *Hayward Lumber*, the lien said "section 22" of a certain township, when the correct description was the "northwest 1/4 of section 33."  (*Id*. at p. 147, italics deleted.)  The *Hayward Lumber* court recognized that two of the three cases it was relying on, *D.I. Nofziger* and *Fernandez,* did not have the benefit of the 1907 mistake-does-not-invalidate

---

8        See footnote 11 above, introducing one of the several predecessors of section 3261.  The statute has undergone a number of transformations over the past 100 years:  from 1203a of the Code of Civil Procedure (Stats. 1907, ch. 474, § 1, p. 858) to section 1203 of the same code (Stats. 1911, ch. 681, § 12, p. 1319), then to section 1196.1, also in the same code (Stats. 1951, ch. 1159, § 1,  p. 2952), then to section 3261 of the Civil Code (Stats. 1969, ch. 1362, § 2, p. 2780), and now to, most recently, section 8422 (Stats. 2010, ch. 697, § 20).

16

statute (at that time, still section 1203 of the Code of Civil Procedure). But it noted that there was a case decided "long after" after the enactment of the statute, *Bishop v. Hayward Lumber & Investment Co.* (1937) 19 Cal.App.2d 234 (*Bishop*), which also held a description to be insufficient. Based primarily on the 1937 *Bishop* case, the *Hayward Lumber* case held the description before it to be "'fatally defective.'" (*Hayward Lumber, supra*, 43 Cal.App.2d at pp. 147-148.)

We decline to follow *Hayward Lumber* because we conclude *Hayward Lumber* misapplied *Bishop*. *Bishop* is a case analogous to a situation where your *neighbors* hire a contractor, don't pay the contractor, the contractor then files a mechanic's lien giving the address of *your* house, and the court holds – quite sensibly – that the contractor doesn't get to foreclose on your house because, after all, the contractor listed the wrong property. That's obviously a situation where section 3261 shouldn't apply *anyway*. Section 3261 was never intended to allow liens on property not benefitted by the work or materials represented by the lien. In our analogy, though, the contractor still might have a valid lien against your neighbor's property, and in point of fact the *Bishop* court said exactly that.[9]

The cases that *are* good precedent on the issue before us include *Bothum v. Kreis* (1929) 101 Cal.App. 683, *American Transit Mix Co. v. Weber* (1951) 106 Cal.App.2d 74, and *Borello v. Eichler Homes, Inc.* (1963) 221 Cal.App.2d 487. As in the case before us, the lien claimant in *Bothum* just plain got the address wrong: 2546 Folsom street in Los Angeles when the right address was 2436 Folsom street, Los

---

9        In *Bishop*, a man named Hess contracted with the lumber company for materials to build certain "premises" on property *not* owned by the plaintiff, Josie Bishop. The lumber company's mechanic's lien listed the property as section "three" of a certain Township 29 South; Josie Bishop owned "section *30*," of the same township 29 South. But the complaint for foreclosure was served on her anyway. She took no notice of the suit because it listed the wrong property, and allowed a default judgment to be taken against her. She then had to file a quiet title action that led to the *Bishop* opinion. The trial court agreed with her, quieted title, and the lumber company appealed. The lumber company lost, with the court citing the omission language from *Penrose* and *Fernandez*. (*Bishop, supra*, 10 Cal.App.2d at p. 237.) Obviously the *Bishop* court was not concerned about whether the description in the mechanic's lien was sufficient as to the property that really *was* improved, and the court said that explicitly. (See *id*. at p. 238.)

17

Angeles.[10] (*Bothum, supra*, 101 Cal.App. at p. 684.) Applying the predecessor statute to section 3261, the court excused the error, noting that on the record before the court one couldn't say the erroneous street number actually designated any actual street number or building on Folsom street. (*Id*. at p. 686.)

In *American Transit*, the lien claimant made a one-digit error, "Lot 2 in Block 2677 of Richland Tract," when the right description was "Lot 2 in Block 3677 of Richland Tract." (*American Transit, supra*, 106 Cal.App.2d at p. 77.) The court summarily dismissed the argument the mistake was fatal merely by referring to the statute (then in its section 1203 incarnation) and paraphrasing how it worked. The implication was that if there were no fraud or prejudice to a later third-party buyer, nothing more need be said. (See *id*. at pp. 77-78.)

In *Borello*, the lien claimant said "Unit 3 and Unit 4, Terra Linda, San Raphael" when he should have said "Terra Linda *Valley*." (See *Borello, supra*, 221 Cal.App.2d at p. 492, italics added.) Terra Linda *Valley* was, in fact, a separate subdivision, as were two others that had the name Terra Linda in them. (*Id*. at pp. 494-495.) Indeed, the general area was known as Terra Linda. The court reasoned that the lien was good because it gave a "general geographical area" that embraced one of four subdivisions, and there were other identifying facts, most importantly that the owner never owned any unit 3 or 4 in Terra Linda Valley. (See *id*. at p. 495.)

There is no hint in this case that R3 had any intent to defraud, or that an innocent party buying from Kohl's would not be on notice of the lien. Kohl's argument that R3's listing of an address that did not apply to Kohl's property *necessarily* precludes application to Kohl's property *as a matter of law* therefore fails.

---

10 A few other things were wrong too, such as the number of the tract block, a mention of "maps" when it should have said "miscellaneous records," and an omission of the descriptive name "Ganahl" from the Brooklyn Heights tract where the work was done. (See *Bothum, supra*, 101 Cal.App. at p. 684.)

18

That still leaves the possibility that Kohl's might prevail *as a matter of fact* on the theory the description of the property in the lien was still insufficient to identify the tract. As *Borello* points out, the question of the sufficiency of the identification is a question of *fact* for the trier of fact. (*Borello, supra*, 221 Cal.App.2d at p. 494.) And that is an issue Kohl's does not attempt to tackle. The record in this case contains roughly 65 pages of photographs together with the testimony of R3's vice president as to the physicality of the 1491 address in relation to the Kohl's building. Kohl's has not attempted to summarize this evidence, much less explain why it was insufficient to identify the Kohl's property. Any insufficiency argument has therefore been waived.

E. *Did the Statute of Limitations for Filing a Foreclosure Action Run on Either Cass's or R3's Foreclosure Actions? No.*

The basic facts bearing on the question of whether the statute of limitations ran on either Cass's or R3's mechanic's lien are not in dispute: Section 3087 provided for a 90-day statute of limitations to file a foreclosure action, which begins to run from the filing of the lien. Both Cass and R3 met that 90-day deadline when they filed "an action" (the key phrase from the statute itself) to foreclose their liens, but in neither case did they name either Kohl's or Wells Fargo in their original complaints. And both Kohl's and Wells Fargo were owners of parcels in the tract at the time of the original complaints. Only later, by the device of substituting Kohl's or Wells Fargo in place of various Does in their original complaints, were Cass and R3 able to obtain judgments foreclosing their liens that applied to Kohl's and Wells Fargo's interests in the tract.

The actual language of the 90-day statute of limitations applying to mechanic's liens only requires "an action" be filed within the 90 days. (See *Grinnell Fire, supra*, 183 Cal.App.3d at pp. 355, 357 [recognizing point made by appellant].) Beginning in 1933, however, in *Paramount Sec. Co. v. Daze* (1933) 128 Cal.App. 515, the Court of Appeal engrafted a common law requirement that the mechanic's lien foreclosure action "'must be brought against all of those whose rights, estates, or interests

19

are claimed to be adverse and subordinate.'" (*Id*. at p. 517, quoting *Continental & Commercial Trust & Sav. Bank v. Pacific Coast Pipe Co.* (9th Cir. 1915) 222 F. 781, 788 [construing analogous Idaho statute].)  The theory of the *Paramount* court was that parties having an interest in the property had the basic right to contest either the validity or priority of the asserted mechanic's lien.  (See *id*. at p. 518.)  That theory was amplified by the Supreme Court in *Connolly Development, Inc. v. Superior Court* (1976) 17 Cal.3d 803, 812, where the court observed that mechanic's liens *do* subject owners to the deprivation of their property, and thus constitute a "taking" of property by the government.  Accordingly, said *Connolly*, there must be old-fashioned notice-and-opportunity-to-be-heard due process protections before property owners can lose their land to mechanic's lien foreclosures.  (See *id*. at p. 812. ["The owner whose property has been subjected to a mechanics' lien . . . cannot be denied the protection of the due process clause."].)

A decade after *Connolly*, the appellate court in *Grinnell Fire* dealt with the question of whether Doe pleading might solve the problem of a lien claimant who isn't actually certain of who is the owner of the property being liened.  *Grinnell Fire* reasoned that since it was clear the Legislature never intended to impose on mechanic's lien claimants the expense of title searches, the requirement that all interested parties must be named in the foreclosure complaint could be satisfied by the device of Doe pleading pursuant to section 474 of the Code of Civil Procedure.  (See *Grinnell Fire, supra*, 183 Cal.App.3d at pp. 358-359.)  But as a caveat, *Grinnell Fire* recognized that Doe pleadings are only allowed when the plaintiff does not have *actual knowledge* of the identity of the party latter named as an initial Doe defendant.  (See *id*. at p. 360.)

By way of illustration of the power of Doe pleading as approved in *Grinnell Fire*, the court in *Westfour Corp. v. California First Bank* (1992) 3 Cal.App.4th 1554 held that the statute of limitations did not run in a case where the lien claimant only knew a bank was in the "*probable* position" of being a construction lender,

20

but still did not have actual knowledge of that bank's deed of trust against the property at the time it filed its original complaint. (See *id*. at pp. 1559-1560, italics added.)

Given this history, the statute of limitations issue before us boils down, as both Wells Fargo and Kohl's acknowledge, to whether Cass or R3 had *actual knowledge* of either Wells Fargo's or Kohl's interests in the property at the time they filed their original complaints to foreclose the tract.[11] Both Wells Fargo and Kohl's assert there was actual knowledge on the part of both Cass and R3, though they arrive there by slightly different routes.

We begin with Wells Fargo, as successor to Wachovia. Wells Fargo, obviously laboring in the shadow of *Westfour*, tries to bridge the crevice between (a) only being known to *probably* have had a deed of trust on some property and (b) being known to *actually* have had one, by reference to a definitional statute, section 3087. Section 3087 stated that the definition of a construction lender for purposes of the mechanic's lien law was an entity that is a beneficiary of a deed of trust in the property.[12]

The argument, however, fails because Doe pleading depends on the actual and subjective knowledge of lien claimant, while section 3087, at most, gives a legal

_____

[11] In *Connolly*, the Supreme Court pointed out that procedural due process even extended to such "minor deprivations as a 10-day suspension from school." (*Connolly, supra*, 17 Cal.3d at p. 812, citing *Goss v. Lopez* (1975) 419 U.S. 565.) Thus an owner whose property has been "subjected" to a mechanic's lien is entitled to procedural due process protection. The *Connolly* court went on to opine, though, that because an owner still has possession and use of the land, the deprivation effected by a mechanic's lien was sufficiently minor that California's mechanic's lien statutes still accord procedural due process. But the 1976 *Connolly* opinion was, of course, issued prior to *Grinnell Fire's* imprimatur on Doe pleading to effectively circumvent the 90-day requirement to name all interested parties. Which brings us to the point of this footnote: Despite the fact both Kohl's and Wells Fargo are quick to point out the relatively long periods of time that elapsed between the original foreclosure complaints and their being named as Doe defendants – more than 800 days according to Wells Fargo – neither owner has made the *constitutional* argument that an *excessively* long period between the filing of the complaint and the substitution of a Doe might contravene due process. That is an issue for another day. Neither Kohl's nor Wells Fargo complain, for example, that they were prejudiced in their trial preparation because of the delay or that they suffered any cognizable loss by the continuing *existence* of the liens on the tract in the time period between the filing of the action and service of the action on them as Doe defendants.

[12] Section 3087 provided in its entirety: "'Construction lender' means any mortgagee or beneficiary under a deed of trust lending funds with which the cost of the work of improvement is, wholly or in part, to be defrayed, or any assignee or successor in interest of either, or any escrow holder or other party holding any funds furnished or to be furnished by the owner or lender or any other person as a fund from which to pay construction costs."

definition of "construction lender" and hence only "constructive" knowledge. Constructive knowledge is a fiction. It's imputed knowledge, not actual knowledge. Thus it does not follow from the mere existence of a deed of trust on a given property that a lien claimant *actually knows* there's a construction lender, or who that construction lender is.

The proof that only actual, and not constructive, knowledge will defeat a Doe pleading is found in a case relied on by the *Grinnell Fire* court, *Irving v. Carpentier* (1886) 70 Cal. 23. There, the plaintiff sued to quiet title in certain land in Alameda County. He named a number of defendants (including Leland Stanford and Charles Crocker), but failed to name a particular defendant even though he would have learned of the defendant's interest if he had merely looked in "a book of records." (*Id.* at p. 25.) But such constructive knowledge did not, said our high court, prevent him from using the device of Doe pleadings under section 474. The court drew a clear line between (a) actual ignorance and (b) what he might have learned had he conducted a title search: "Moreover, the affidavit of Douty does not show that plaintiff was ignorant. It shows that *if* he had examined a book of records named he would have discovered that a certain deed purported to be there recorded. *But this does not show that the plaintiff was ignorant of the fact when he commenced his suit. It merely shows that he failed to examine a certain book*, which if he had examined would have afforded him some information. His failure to examine tends to establish the fact of ignorance." (*Ibid.*, italics added.) Since Wells Fargo doesn't point to any uncontroverted evidence showing Cass actually knew Wells Fargo or Wachovia had a deed of trust on the property when it filed its suit, its statute of limitations argument fails.

Kohl's argument is a little different: It's a straight-up-the-middle substantial evidence challenge. Kohl's points to evidence that Cass contacted Kohl's in relation to obtaining payment from 361. Such evidence means, says Kohl's, Cass *necessarily* knew – and this is where Kohl's brief uses some conspicuously

22

circumlocutory language – "of Kohl's identity and relationship to Cass's claims." Kohl's can't quite bring itself to state outright that Cass *knew* Kohl's was an owner. Kohl's must fall back on whatever insinuation can be eked out of the fact that people knew Kohl's had an "involvement" in the construction of one of its stores.

There is an obvious parallel in Kohl's argument here to the one we have already rejected in part III.C. above. The theory that Cass *just had* to have known Kohl's owned some of the land in the tract is not supported by substantial evidence. As shown in part III.C. above, there was substantial evidence that Cass didn't know Kohl's was an owner.

Finally, we must note an argument that is not developed in Wells Fargo's brief in regard to the statute of limitations: Is the fact Cass initially listed Wells Fargo as Doe 91 – a Doe that has nothing to do with the foreclosure cause of action – grounds for reversal of the foreclosure judgment as related to Wells Fargo? The issue is waived. Wells Fargo never makes the formal argument, by way of proper heading or subheading, in its opening brief (see Cal. Rules of Court, rule 8.204(a)(1)(B)).[13]

F. *Is Cass Limited in Its Foreclosure Action to the Amount Stated in its Lien?*

*No.*

Cass's mechanic's lien listed $1,835,999.59 as the amount owed. Its complaint in foreclosure gave the same figure. Nevertheless, the trial court gave Cass an award that, exclusive of interest, was for $2,023,896.21, or about $190,000 more than the amount listed in the lien. The difference is accounted for in Cass's January 2008 billing: $1,835,999.59 was the amount prior to the billing, $2,023,896.21 is the amount after the billing.[14]

---

[13] The two statute of limitations arguments that Wells Fargo does make by way of heading or subheading are: (1) The "actual knowledge" argument we have already considered, and a variation of *that* argument, which is (2) that lien foreclosure plaintiffs must name all interested parties, not just parties who are junior to the lienholders' interest.

[14] Apropos the argument we addressed in part III.B. above, neither Kohl's nor Wells Fargo make the argument that the January billing was *not* part of the contract so as to render the January 26, 2008 lien premature.

Did the court err? No. Three statutes, sections 3084, 3118, and 3123, when read together, are incompatible with Kohl's and Wells Fargo's proposed per se rule that a judgment foreclosing a mechanic's lien can never exceed the amount stated in the lien itself. First, section 3084 (quoted in footnote 6 above) merely requires mechanic's liens to state a "demand." The word "demand" does not denote exactitude. Rather it denotes a *claim* which is subject to either negotiation or litigation. (See *Root v. American Equity Specialty Ins. Co.* (2005) 130 Cal.App.4th 926, 933 ["'The action or fact of demanding or claiming in legal form; a legal claim . . . . To ask for (a thing) with legal right or authority; to claim as something one is legally or rightfully entitled to.'" (quoting 4 Oxford English Dict. (2d ed.1989) pp. 430, 431)].) The use of the word demand suggests that the fit between the amount listed in the lien and the amount given by a foreclosure judgment need not be exact.

Second, section 3118 provided for a 100 percent forfeiture of a mechanic's lien if the lien willfully includes amounts of work, labor and material not actually furnished.[15] The provision obviously operated to give lien claimants a major incentive not to assert *any* items which cannot be supported in the push-come-to-shove of lien foreclosure litigation. But there is a necessary logical implication to section 3118's harshness: The Legislature was clearly giving lien claimants an incentive to err, if at all, on the low side in stating lien claims, with the implication being an opportunity to make up for it in the actual foreclosure judgment.

And, finally, section 3123, the statute that directly addressed any limits on the amounts that might be recovered via a mechanic's lien, uses the inexact phrase "reasonable value" as one of the two express limits on recovery amounts: either

---

[15] "Any person who shall willfully include in his claim of lien labor, services, equipment, or materials not furnished for the property described in such claim shall thereby forfeit his lien.

24

reasonable value, or the contract price, *whichever is less*.[16]  Section 3123 is thus an instance where the interpretive adage *expressio unius est exclusio alterius* really does apply:  If the Legislature had wanted to limit recovery to just the figure in the lien, it could easily have said so in section 3084.  It didn't.  The limit is the contract price, not the lien amount.

Kohl's and Wells Fargo make no argument that the amount of the judgment is based on a figure beyond the contract price or that the amount was somehow *unreasonable*.  Kohl's and Wells Fargo's argument, rather, is based on the analogy of mechanic's liens to mortgages:  The foreclosure of a mechanic's lien resembles the foreclosure of a mortgage, and when it comes to mortgages there is no question the recovery must be limited to the amount secured by the mortgage, ergo the recovery on the foreclosure of a mechanic's lien is also limited by the stated amount of the lien.

But Kohl's and Wells Fargo read too much into their analogy.  While both areas of law involve "foreclosure," the origins of the right to foreclose are decidedly different.  The foreclosure of a mortgages ultimately is a matter of voluntary contract; the foreclosure of a mechanic's lien (at least in a case involving an innocent owner) is a matter of the imposition of an obligation on a landowner independent of contract.[17]

The case on which Kohl's and Wells Fargo rely for the mechanic's lien/mortgage analogy, *Laubisch v. Roberdo* (1954) 43 Cal.2d 702, merely stands for the

---

[16]       "(a) The liens provided for in this chapter shall be direct liens, and shall be for the reasonable value of the labor, services, equipment, or materials furnished or for the price agreed upon by the claimant and the person with whom he or she contracted, whichever is less. The lien shall not be limited in amount by the price stated in the contract as defined in Section 3088, except as provided in Sections 3235 and 3236 and in subdivision (c) of this section.
             "(b) This section does not preclude the claimant from including in the lien any amount due for labor, services, equipment, or materials furnished based on a written modification of the contract or as a result of the rescission, abandonment, or breach of the contract. However, in the event of rescission, abandonment, or breach of the contract, the amount of the lien may not exceed the reasonable value of the labor, services, equipment, and materials furnished by the claimant.
             "(c) The owner shall notify the prime contractor and construction lenders of any changes in the contract if the change has the effect of increasing the price stated in the contract by 5 percent or more."

[17]       This basic principle will cut the other way in part III.J. anon.

proposition that the *purchaser at a mechanic's lien foreclosure* sale is just as much the new owner of the property as *the purchaser at a mortgage foreclosure sale*. In *Laubisch*, there was a judgment ordering a mechanic's lien foreclosure in January 1941 but there was no actual foreclosure sale until March 1946. World War II intervened, and, during the war, the owner of the property at the time of the mechanic's lien transferred the property to a woman named Roberdo, who in turn transferred the property to a woman named Wentworth, who in turn transferred it to a woman named Cowan, and when the purchaser at the 1946 mechanic's lien foreclosure sought to quiet title and obtain rent from Cowan, Cowan argued she had acquired the property by adverse possession. In the process of knocking down Cowan's adverse possession claim, the Supreme Court simply made the point that no statute of limitations was running against the purchaser at the mechanic's lien foreclosure, just as no statute of limitations would have run against a purchaser at a mortgage foreclosure sale. (*Id*. at pp. 706-707.) Such a rationale hardly stands for the proposition that the judgment foreclosing the mechanic's lien is per se limited in amount to the amount stated in the lien.[18]

G. *Did the Court Err in Including Amounts Owed to TNT in the Judgment for Cass?  No.*

We now come to one of the trickiest aspects of an all-too-tricky appeal: What to do about TNT's corporate suspension? The undisputed facts are that Cass subcontracted with TNT Grading Inc. – and the "Inc." is important – to do some of Cass's grading work. TNT didn't get paid, and filed a mechanic's lien for $608,018.39 against the tract, plus (timely) sued *Cass* and Doe owners, seeking foreclosure of its

---

[18] Because we determine the trial court correctly followed the lien statutes, we need not address Cass's auxiliary argument that Kohl's was estopped to claim the lien amount should not include the January billing because Kohl's construction manager actually told Cass to "go ahead and file the lien" in a phone conversation with a Cass employee (Jerry Gaeir). The circumstances behind the estoppel argument were that the construction manager said he never trusted 361 anyway, and told the Cass employee to "go ahead and file a lien so he could have a reason to stop payment." There is no need to address the argument and it wouldn't bind Wells Fargo anyway. We also do not address Cass's argument that section 3261 also operated to allow the judgment to include the additional $190,000.

mechanic's lien. No one argues that TNT's mechanic's lien was in any way invalid when recorded. However, as Kohl's trial counsel explained to the court in reference to a motion in limine,[19] TNT's corporate status had been suspended by the time of trial, and TNT had filed a dismissal of its action. Even so, Cass's trial counsel told the trial court prior to trial that Cass had "agreed to pay TNT through a pass through agreement." However, as Kohl's now points out, no evidence of any pass-through agreement or assignment of TNT's rights to Cass was offered by Cass at the trial. And Cass, for its part, makes no effort in its briefing to show that it has *any* obligation to TNT in the wake of TNT's corporate suspension. Cass thus makes no claim in its briefs on appeal that if the judgment is affirmed it will fork over to TNT the $608,018.39 *Cass itself* didn't pay TNT on the TNT-Cass subcontract. In light of these facts, Kohl's now asserts the inclusion of $608,018.39 in the foreclosure judgment for Cass was error.

The question boils down to whether TNT was a "claimant" under section 3140. Section 3140 provided, in its entirety: "Any original contractor or subcontractor *shall be entitled to recover*, upon a claim of lien recorded by him, *only* such amount as may be due him according to the terms of his contract *after deducting all claims of other claimants* for labor, services, equipment, or materials furnished and *embraced within his contract*." (Italics added.)

The key to section 3140 is to ask precisely *when* the contractor or subcontractor is to recover the amount in light of the specified deductions. The answer is, we think, in the *judgment* foreclosing the lien, because only a judgment will reflect the various deductions of other claimants that have been aired before the court. The question then becomes, who is a "claimant?" There is a statutory answer found in section 3085: "'Claimant' means *any person entitled* under this title to *record a claim of lien*, to give a

---

19 Kohl's counsel was seeking an in limine order to prevent a representative from TNT, then suspended, from testifying on Cass's behalf. The request was denied.

27

stop notice in connection with any work of improvement, or to recover on any payment bond, or any combination of the foregoing." (Italics added.)

While there is no question that TNT was "entitled," while it was still a viable corporation, to record a mechanic's lien – indeed it did so – there is also no question that it was *not* "entitled" to prosecute any claim, lien or otherwise, *by the time of trial and the ensuing judgment*. As explained in *Center for Self-Improvement and Community Development v. Lennar Corporation* (2009) 173 Cal.App.4th 1543, 1552, a suspended corporation is dead to the law. It "cannot sell, transfer or exchange real property in California, and contracts entered into during the time of suspension are voidable by the other party or parties through legal action." Moreover, it may not "prosecute or defend an action, seek a writ of mandate, appeal from an adverse judgment, or renew a judgment obtained before suspension." (*Ibid*.) While a suspended corporation *can* revive itself by paying back taxes plus interest and penalties to the Franchise Tax Board (see Rev. & Tax. Code, § 23305), statutes of limitations keep running during the period of suspension, so a revived corporation's claim will be time barred if the statute of limitations runs during the period of suspension. (*Sade Shoe Co. v. Oschin & Snyder* (1990) 217 Cal.App.3d 1509, 1512-1513.)

We recognize that, strictly speaking, the inclusion of the $608.018.39 in Cass's judgment of lien foreclosure is a windfall to it, at least if for some reason it doesn't forward the amount onto TNT as it represented to the trial judge it would do. Even so, we note that Kohl's and Wells Fargo will clearly be entitled to offset the $608,018.39 encompassed within Cass's lien should TNT ever, by some chance, revive itself and try once again to foreclose its lien on the tract. (See *Stone v. Serimian* (1926) 198 Cal. 520, 523-524; *Wyman v. Hooker* (1905) 2 Cal.App. 36, 40; see also *Ferelli v. Weaver* (1962) 210 Cal.App.2d 108, 113 [no error where trial court made payment of money owed to contractor contingent on contractor's first paying subcontractors liens].)

28

Though there is a windfall to Cass (or not, depending on whether it honors its promise to TNT[20]), there is no corresponding loss to Kohl's or Wells Fargo: *They* are no worse off than if TNT had paid its corporate taxes and prosecuted its lien to judgment. Indeed, were we to rule in their favor on this point, they might obtain a genuine windfall, free and clear of any obligation to TNT should it ever be revived. In that case, Cass might owe TNT the $608,018.39 for unpaid work, but Cass would have no recourse against Wells Fargo or Kohl's for it even though their property would have been improved by that amount.

H. *Did the Trial Court Abuse its Discretion by Not Allocating the Judgment Among the Three Parcels Within the Tract?  No.*

As mentioned, the "tract" consists of three parcels. Kohl's building sits on parcel 2 only. Parcels 1 and 3 have infrastructure put there by Cass, R3, TNT, and Palomar Grading, but no buildings proper. Both Kohl's and Wells Fargo now assert the trial court should have allocated the judgment foreclosing the mechanic's liens of all successful lien claimants between the various parcels. At the very least such allocation would spare Kohl's and Wells Fargo the further legal expense of allocating between themselves how to apportion the judgments.[21]

The issue distills to this legal question: Did, somehow, the trial court contravene, or otherwise abuse any discretion committed to it pursuant to, the statute governing allocation in the context of mechanic's liens, section 3130?

---

20      From our point of view, the question of whether Cass obtained a formal assignment of TNT's rights is, in fact, irrelevant. Section 3140 operates by taking the contract amount and then *deducting* amounts owed to claimants "embraced within" that contract. Here Cass isn't predicating its right to recover, like the plaintiff in *Kimber v. Jones* (1954) 122 Cal.App.2d 914, on an assignment. It is predicating its right to recover on its contract. Had TNT stuck around and remained in the case, TNT could have had $608,018.39 of the foreclosure in its own right as Cass's subcontractor, and Cass's recovery would have been reduced by that amount (§ 3143).

21      Their briefs raise the specter of the various lien claimants being able to pick and choose as to which of the parcels will be foreclosed on. That is a chimera. Looking at the judgment the whole tract will be foreclosed upon.

29

No.  We reproduce the entirety of section 3130 in the margin.[22]  As the combined reply brief of Kohl's and Wells Fargo observes, section 3130 "is a confusingly worded statute."[23]  Confusing as it is, though, we have threaded our way to this conclusion:  Section 3130 only applies in cases where there is more than one "work of improvement."

The phrase "work of improvement" is statutorily defined in section 3106: "'Work of improvement' includes but is not restricted to the construction, alteration, addition to, or repair, in whole or in part, of any building, wharf, bridge, ditch, flume, aqueduct, well, tunnel, fence, machinery, railroad, or road, the seeding, sodding, or planting of any lot or tract of land for landscaping purposes, the filling, leveling, or grading of any lot or tract of land, the demolition of buildings, and the removal of buildings.  Except as otherwise provided in this title, *work of improvement' means the entire structure or scheme of improvement as a whole*."  (Italics added.)

The trial court explicitly found, as a factual matter, that the work of the lien claimants was pursuant to *one* scheme of improvement as a whole.  Said the statement of decision:  "The overwhelming weight of the evidence established that the work of improvement, from its inception to completion was one unified project, including all

---

[22]  "In every case in which one claim is filed against two or more buildings or other works of improvement owned or reputed to be owned by the same person or on which the claimant has been employed by the same person to do his work or furnish his materials, whether such works of improvement are owned by one or more owners, the person filing such claim must at the same time designate the amount due to him on each of such works of improvement; otherwise the lien of such claim is postponed to other liens.  If such claimant has been employed to furnish labor or materials under a contract providing for a lump sum to be paid to him for his work or materials on such works of improvement as a whole, and such contract does not segregate the amount due for the work done and materials furnished on such works of improvement separately, then such claimant, for the purposes of this section, may estimate an equitable distribution of the sum due him over all of such works of improvement based upon the proportionate amount of work done or materials furnished upon such respective works of improvement.  The lien of such claimant does not extend beyond the amount designated as against other creditors having liens, by judgment, mortgage, or otherwise, upon either such works of improvement or upon the land upon which the same are situated.

"For all purposes of this section, if there is a single structure on more than one parcel of land owned by one or more different owners, it shall not be the duty of the claimant to segregate the proportion of material or labor entering into the structure on any one of such parcels; but upon the trial thereof the court may, where it deems it equitable so to do, distribute the lien equitably as between the several parcels involved."

[23]  Which is not altogether atypical of language in some of the pre-2012 statutes.  (Cf. *Halbert's Lumber, Inc. v. Lucky Stores, Inc.* (1992) 6 Cal.App.4th 1233, 1248-1249 [language and legislative history very confused as to pre-1993 version of section 3262].)

30

three parcels, with one owner, Inland-LCG Beaumont, LLC, one lender, Wachovia, and one general contractor, 361 Group. Cass was not required to allocate the value of its work between the three parcels included in the project."

Conspicuously absent from the otherwise voluminous briefing of both Kohl's or Wells Fargo is any challenge to the *sufficiency of the evidence* supporting the trial court's finding. Neither of the appellants' briefs provides a clear description of what the evidence showed as to what, precisely, ended up on parcel 2, as distinct from what ended up on parcels 1 and 3. As the appellate rule was recently reiterated in *Estate of Bonzi* (2013) 216 Cal.App.4th 1085, 1107, footnote 7: "A party challenging sufficiency of the evidence must set forth all material evidence, including evidence harmful to the party's position. (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881.) Failure to do so results in the claim being deemed waived. (*Ibid.*; see also *Nwosu v. Uba* (2004) 122 Cal.App.4th 1229, 1246.)" Kohl's and Wells Fargo make no argument that precise items of work on parcels 1 or 3 do not also benefit Kohl's store on parcel 2.

The case law invoked by Kohl's and Wells Fargo on the allocation question is inapposite for that very same reason – the failure to show a substantive demarcation between the property benefitted and the property supposedly not benefitted. Several cases deal with similar situations. *A. J. Raisch Paving Co. v. Mountain View Sav. and Loan Assn.* (1972) 28 Cal.App.3d 832 involved two different tracts both benefitted by a sewer line, with the lien claimant failing to file any lien at all on one of those tracts. The appellate court held the judgment of foreclosure could not include the property outside the lien. (See *id*. at pp. 838-839.)

*Forsgren Associates, Inc. v. Pacific Golf Community Development LLC* (2010) 182 Cal.App.4th 135, Justice Gaut's magnum opus on the subject of mechanic's lien law, involved a situation where the work only slightly benefitted the adjacent and separately owned property – a tee box and a small green area in comparison to a large housing development. (See *id*. at pp. 139-140 [nature of adjacent property included

31

proposed housing development in excess of 4200 homes].) Obviously the failure to allocate under the circumstances – gross disproportionality between a tiny improved portion on one property and substantial improvements to an adjoining property – would have been highly inequitable.

*Pacific Coast Refrigeration, Inc. v. Badger* (1975) 52 Cal.App.3d 233 fits the same pattern. There the property that was intended to be benefitted was a supermarket – the lien arose out of the construction of cooling facilities in the supermarket. The existence of the supermarket, of course, was of some collateral benefit to a nearby property, a gas station. But the gross disproportion in benefits meant the lien based on cooling facilities installed in the supermarket could not extend to the gas station property; in fact, the gas station property had been exempted from the property secured by the deed of trust that gave rise to the construction loan. (*Id*. at pp. 245-246, 248.)

Here, by contrast, Kohl's and Wells Fargo conspicuously do not make any argument that the work on parcels 1 and 3 is so separate and distinct from the work on parcel 2 that equity *required* allocation of the liens as to those respective parcels. The trial court was thus well within its discretion not to allocate the amount of liens between the respective parcels.

I. *Did the Trial Court Err in Awarding the Lien Claimants Prejudgment Interest? No.*

Kohl's and Wells Fargo's argument that no prejudgment interest at all should have been awarded is necessarily dependent on their prevailing on the allocation issue. In *Forsgren*, for example, where allocation was required, the appellate court concomitantly held the lack of it made it impossible to calculate a liquidated damages claim. The amount was simply not capable of being certainly calculated. (See *Forsgren, supra*, 182 Cal.App.4th at pp. 159-160, citing section 3287.) Here, however, since the whole project was "one ball of wax" – our phrase – or one "scheme of improvement as a whole" – the Legislature's phrase – the trial court used the word "unitary." The

32

calculation of prejudgment interest could thus readily be made certain from the recording of the liens.

J. *Did the Trial Court Err in Awarding the Lien Claimants Prejudgment*
*Interest at 10 Percent, as Distinct from 7 Percent, As Against*
*The Non-Contracting, Innocent Owners?  Yes.*

This is the only part of this opinion certified for publication, so we set forth a brief précis of the relevant facts for the benefit of those readers who will not have access to the balance of the opinion:  In 2007, a developer named Inland, engaged a general contractor called 361, to develop a Kohl's department store and surrounding property on a tract in Beaumont.  The construction lender was Wachovia Bank.  General contractor 361 contracted with, among others, Palomar Grading and Cass to do infrastructural work benefitting the tract.  As it turned out, both Kohl's and Wachovia ended up owning parcels in the tract.  Neither, however, ever entered a contract with the two subcontractors.  Palomar Grading and Cass were not paid for substantial portions of their work, and brought successful actions to foreclose their mechanic's liens.[24]   The trial judge awarded them prejudgment interest at 10 percent,[25] and now Kohl's and Wells

---

[24]     The unpublished balance of this opinion is largely taken up explaining why Cass's and R3's judgments of lien foreclosure are being affirmed.

[25]     We have determined that the decision to award Palomar Grading and Cass prejudgment interest in the first place was a correct one because the precise amounts owed were ascertainable from the initial recording of their liens.  (Cf. *Forsgren Associates v. Pacific Golf Community Development* [(2010)] 182 Cal.App.4th 135, 159-160 [prejudgment interest not appropriate where precise amount of liens on respective properties had not been ascertained by trial court].)

Fargo, as Wachovia's successor, are challenging that decision. We write on a clean slate. No published case has considered the issue.[26]

There is a default rate of interest prescribed by the Constitution in Article XV, section 1, for the "forbearance of any money, goods, or *things in action*, or on accounts after demand, shall be 7 percent per annum." (Italics added.) Things in action obviously include the right to foreclose on a mechanic's lien. The Legislature, however, has enacted section 3289, subdivision (b), specifying that the default *for breach of contract* is 10 percent.[27] The lien claimants in this case argue for the applicability of section 3289's 10 percent, as distinct from the constitutional default rate of 7 percent.

We determine it is the constitutional default rate that should apply to prejudgment interest on a mechanic's lien as applied to noncontracting, innocent owners. Unlike section 3289, the prejudgment interest statute, section 3287, applies to both contract and tort actions. (See *Marine Terminals Corp. v. Paceco, Inc.* (1983) 145 Cal.App.3d 991, 995.) Torts generally do not involve obligations incurred by contract.

---

[26]     In their briefing, the parties dispute the precedential value of the published portion of *Royster Construction Co. v. Urban West Communities* (1995) 40 Cal.App.4th 1158. Answer: It has no precedential value on the interest rate point, even by inference. In *Royster*, a mechanic's lien claimant was awarded prejudgment interest at 10 percent (*id*. at p. 1164), and the appellate court squarely ruled that the judgment had to be modified to reduce the prejudgment interest to 7 percent (*id*. at p. 1171). But why? We don't know. The panel certified *Royster* for publication, excepting its Part 3 involving prejudgment interest. (*Id*. at p. 1158, fn. *.) Strictly speaking, then, while we know what the court *did*, we do not know *why* the court did it. The California Constitution says that "Decisions of the Supreme Court and courts of appeal that determine causes shall be in writing with reasons stated," but in the case of *Royster's* determination that the trial court erred in awarding 10, as distinct from 7 percent prejudgment interest, there were, for our purposes here, no reasons stated. *Royster's* determination, ensconced in the nonpublished part of the opinion, is the functional equivalent of the summary denial of a petition for writ by the Court of Appeal; it didn't determine any cause, and thus has no precedential vale. (See *People v. Kelly* (2006) 40 Cal.4th 106, 116, fn. 1.)

[27]     All statutory references are to the Civil Code. And, as explained in the unpublished portion of this opinion, California's mechanic's lien law used to occupy sections 3082 through 3267 of the Civil Code. Now it occupies sections 8000 through 9566. The switch-over date was July 1, 2012. The Legislature specifically provided that the old law would govern for mechanic's liens recorded before that date. (See § 8052.) Section 3289, however, as it currently stands, was unaffected by the 2012 mechanic's lien statutory switch-overs. The statute provides:
          "(a) Any legal rate of interest stipulated by a contract remains chargeable after a breach thereof, as before, until the contract is superseded by a verdict or other new obligation.
          "(b) If a contract entered into after January 1, 1986, does not stipulate a legal rate of interest, the obligation shall bear interest at a rate of 10 percent per annum after a breach.
          "For the purposes of this subdivision, the term contract shall not include a note secured by a deed of trust on real property."

The salient fact here is that the owners of the property had no contract with either Palomar Grading or Cass. The liens on the property are the result of the imposition of the mechanic's lien laws, not contract. The comments of an appellate panel from the depths of the Great Depression summarize the essence of the legal relationship: "The right of a materialman to have declared and enforced his lien against specific property is a right *provided to him by the organic law*, and shall not be lightly considered. It is true perhaps, that changing conditions have, in some cases, permitted *an apparent injustice to result through enforcement of liens against an innocent owner, or one defrauded through the machinations of a dishonest contractor*." (*Bay Lumber Co. v. Pickering* (1932) 120 Cal.App. 163, 167, italics added.)

We must not forget that, as explained by our Supreme Court in *Connolly Development, Inc. v. Superior Court* [(1976)] 17 Cal.3d 803, the operation of mechanic's liens *do* constitute a "taking" of an owner's interest in its property: "The owner whose property has been subjected to a mechanic's lien has suffered at least as serious a deprivation as did the plaintiffs in [two United State Supreme Court cases], and thus cannot be denied the protection of the due process clause." (*Id*. at p. 812.) But the taking is *justified*, in terms of an owner who is innocent of breaching a contract with an unpaid lien claimant, precisely because the owner's property has been benefitted by the work or material of the lien claimant. "The purpose of a mechanics' lien is to prevent unjust enrichment of a property owner at the expense of laborers or material suppliers." (*Basic Modular Facilities, Inc. v. Ehsanipour* (1999) 70 Cal.App.4th 1480, 1483.) But that benefit is not necessarily the result of an owner's *contract* with the lien claimant. Just as prejudgment interest can be given in tort cases, an owner who didn't contract with a lien claimant can be legally exposed to prejudgment interest. It follows, then, that the statutory default rate for *contract* breaches of 10 percent should not be applicable to innocent, noncontracting owners, who are analogous to tort defendants, not contract defendants.

35

The lien claimants here posit two theories against our conclusion. Palomar Grading's is direct. It simply isn't "fair," says Palomar Grading, to charge 10 percent against the "improver of land" – by which it appears Palomar Grading means a general contractor who breaches a contract with a subcontractor – and let an owner get away with only 7 percent. But it *is* fair, when one realizes the owner's loss is a matter of operation of law, not voluntary choice. Unfortunately, general contractors sometimes stiff their subcontractors after taking money from the owner or the owner's banker. In that situation the mechanic's lien law in effect forces innocent owners to pay twice. To be sure, their paying twice may be justified by the special solicitude shown toward unpaid contractors and material suppliers by the mechanic's lien law – that law is, after all, part of the California Constitution (Article XX, section 15) – but the justification for the loss of property in the case of innocent owners is certainly not that they *agreed* to it. Thus it is perfectly "fair" that the defaulting contractor who breached its contract should have to pay a higher rate than an innocent owner who didn't.

Cass makes a different argument. It focuses on its right to recover the amount due according to its contract. For Cass, because it is "entitled to recover the amount due pursuant to its contract" it should receive 10 percent interest, period. But that logic ignores section 3123. The statutory language is: "The liens provided for in this chapter shall be direct liens, and shall be *for the reasonable value* of the labor, services, equipment, or materials furnished *or* for the *price agreed upon by the claimant and the person with whom he or she contracted*, whichever is *less*." (Italics added.) Thus a lien claimant does not *necessarily* receive the amount due on its contract. Again, we see that insofar as the mechanic's lien laws act on an innocent owner, the obligation is non-contractual – *limited by statute* to the reasonable value of work when it is less than the contract.

Cass's brief also cites some language from a comment apparently in the 4th edition of the respected Marsh treatise on Mechanic's Lien law, to the effect "it is safe to

36

say only that the lien claimant's right to interest is limited to the legal rate (now 10%)." There are two answers to the proffered quotation: One, the quotation only refers to a *limit*, not what is actually appropriate, and doesn't – at least in the snippet Cass gives us – address prejudgment interest as such. And two, while the "safe to say" language might have been found in the 4th edition of Marsh, it is not to be found in section 4.75 of either the hard copy of current 6th edition or the current online version. (See 1 Marsh, Cal. Mechanics' Lien Law (6th ed. 2011) § 4.75, pp. 4-93 to 4-95.) Moreover, that particular section of Marsh is written as a practice guide from the point of view of an attorney for a lien claimant, and the thrust of the section is *not* "this is the law," but "there's no harm in trying."[28]

Obviously our brief decision in regard to the prejudgment interest issue does not address the question of prejudgment interest in the case of culpable, contract-breaching owners, that is, owners who breach their contracts with contractors or materials suppliers and for *that* reason have a mechanic's lien slapped on their property. We also do not address the possibility (far-fetched to be sure) of a sham change in ownership (from say, a breaching owner to an ostensibly non-breaching one) done deliberately to try to gain a better interest rate. Our decision today only applies to "innocent" owners who, even though they did not breach their own contracts, nonetheless winded up with property subject to a mechanic's lien.

Because this section is self-contained in the context of this partially published opinion, we state our disposition as to the prejudgment interest issue now: The

---

[28] We'll quote the current (2014) comment in its entirety here: "Under current statutes and decisions, it appears *that there is no prohibition against claiming interest* (and/or damages) *according to agreement, or at 10 percent from date of breach*, but it should be recognized that the lien or stop notice as such creates no special remedy in this regard. *On the other hand*, the lien on the owner's property is limited by Civil Code section 8430(a) to agreed price or reasonable value, whichever is less – so that is a matter for the judge or jury in any particular trial court and case." (Https://advance.lexis.com/GoToContentView?requestid=6ba37554-e1cb-5648-57a1-aea380bdd994&crid=7a0facc0-c04e-281c-4134-1286943094d8 <as of July 10, 2014>.)

This is not exactly a ringing endorsement of the idea that the law *requires* 10 percent prejudgment interest against innocent owners.

judgment is reversed insofar as it provides for a rate of prejudgment interest at 10 percent and is remanded for a recalculation at the rate of 7 percent. The topic of appellate costs is covered in the unpublished disposition.

## IV. DISPOSITION

The judgment is affirmed in all respects except to the degree it provides that liens of Palomar Grading and Cass should include prejudgment interest at the rate of 10 percent. To that degree we reverse the judgment and remand it with instructions to the trial court to recalculate the prejudgment interest at 7 percent.

On balance, the respondents Cass and R3 are still the prevailing parties in this appeal: Of 10 issues raised, they have prevailed, either singly or together, in 9. They shall recover their costs on appeal from Kohl's and Wells Fargo.

It is a different matter for Palomar Grading. The only issue on which it has appeared in this appeal is the issue of the proper rate of prejudgment interest, and on that issue it lost. However, it would be unfair to allow Kohl's and Wells Fargo to recover all their appellate costs from Palomar Grading because they won on the lone prejudgment interest rate issue. *Most* of this appeal has concerned their unsuccessful challenges to the foreclosure judgments obtained by Cass and R3.

Accordingly, insofar as Palomar Grading is concerned, the parties will bear their own costs on appeal.


                                                        BEDSWORTH, J.

WE CONCUR:



RYLAARSDAM, ACTING P. J.



ARONSON, J.


38